# Newlin, Fernley & Co. *v.* McAfee.

*Bill in Equity to enforce Equitable Mortgage on Lands.*

| 64 | 357 |
|----|-----|
| 94 | 318 |
| 64 | 357 |
| 100 | 346 |
| 64 | 357 |
| 103 | 538 |
| 64 | 357 |
| 107 | 276 |
| 107 | 517 |
| 64 | 357 |
| 111 | 665 |
| 64 | 357 |
| 125 | 532 |
| 64 | 357 |
| 131 | 70 |
| 131 | 546 |

1. *Fraudulent chancery decree ; how impeached.*—An original bill, in the nature of a bill of review, impeaching a decree for fraud, can only be filed by a party or privy to the decree; but strangers, who are intended to be defrauded by it, may impeach it collaterally, either at law, or in equity.

2. *Equitable mortgage ; what constitutes.*—To create a charge or trust, which a court of equity will enforce as a mortgage, the form of the agreement is not material, and operative words of conveyance are not necessary : if the intention of the parties appears from their agreement, when read in the light of the circumstances surrounding them at the time, to charge particular property, rights of property, or credits, with the payment of debts, the court will regard it as an equitable mortgage, and will give effect to it as against all persons except innocent purchasers for value.

3. *Same.*—An embarrassed debtor at the close of the late war, owning property largely exceeding in value the amount of his debts, furnished to his northern creditors a schedule of his lands, with the prices paid for the different tracts; and a written agreement was thereupon entered into between them, by which the creditors remitted the interest accrued on their debts during the war, and granted him indulgence for two years; and, in consideration thereof, it was stipulated, that the real estate mentioned in his schedule, a copy of which was annexed to the agreement, "is to be held by the said G. T. M." debtor, "in trust for the creditors signing this agreement; and whenever the same is sold, the proceeds of said sales shall be appropriated and paid over, as soon as received, *pro rata* among the subscribers hereto, in proportion to the amounts severally due"; and the debtor added, "I agree to and accept as binding the terms of this agreement, and that the property hereinbefore stated shall be faithfully held and disposed of for the purposes herein contained." *Held,* that the agreement was an equitable mortgage, although no words of conveyance were used.

4. *Bankruptcy ; equitable liens.*—The provision contained in the late bankrupt law, saving liens or mortgages on the debtor's property, real or personal, applies to equitable liens or mortgages as well as legal rights.

5. *Homestead exemption; alienation in 1865, and assignment by bankrupt court.*—Under the statutes existing in 1865, there was no limitation on the owner's power to alienate his homestead; and neither he nor his wife could set up a claim of homestead against an equitable mortgage created by him on his lands; and the subsequent assignment of a homestead in them, by the District Court in bankruptcy, would have no effect as against such equitable mortgage.

6. *Conclusiveness and effect of decree.*—A decree in favor of the wife, under a bill filed by her against her husband, to compel him to account for the hires of her slaves received and used by him, and to fasten a trust on his lands for her money used in paying for them, is not *in rem*, but strictly *in personam*, and binding only on parties and privies; and as against antecedent creditors of the husband, seeking to subject the lands to an equitable mortgage, the *onus* of proving the trust and the debt, as alleged, rests on the parties claiming under the decree.

7. *Equitable estate of wife ; husband's liability for rents and profits.*—The wife is entitled to the rents and profits of her equitable estate, and may prevent her husband from receiving them; but, if she allows him to receive and use them, without dissent on her part, and without an express promise on his

part to account for them, the presumption of a gift to him arises; and to repel this presumption, in a contest with his creditors, especially after the lapse of many years, the proof must be clear and convincing.

APPEAL from the Chancery Court of Talladega.

.Heard before the Hon. N. S. GRAHAM.

The bill in this case was filed on the 29th September, 1873, by Newlin, Fernley & Co., J. B. Lippincott & Co., and Siter, Van Culin & Glass, three mercantile firms doing business in the city of Philadelphia, against Green T. McAfee, and his several children by his deceased wife, Mrs. Elizabeth L. McAfee; and sought to enforce, in favor of the complainants and certain other creditors of said G. T. McAfee, an equitable mortgage on his lands, and to. set aside, on the ground of fraud, a decree in chancery which Mrs. McAfee had obtained against her husband, declaring a trust in the said lands in favor of her and her children. Before the late war, McAfee was doing business as a merchant in Talladega; and on the 22d February, 1860, being indebted to the several complainants in this suit, he executed his promissory notes to each firm for the amount of his indebtedness to them. At the close of the war, desiring to make a compromise or settlement of his debts, in order that he might continue his business, he forwarded to his creditors in Philadelphia a schedule of his property, showing the different tracts of land which he owned, and the prices paid for each. The schedule embraced five tracts of land, containing in the aggregate 1,750 acres, besides two houses and lots in town; and the entire cost was $11,500, not including the value of one tract of 80 acres, for which $10,000 was paid in Confederate money during the war. On being furnished with this schedule, an agreement was entered into between the several creditors in Philadelphia and New York and said McAfee, which was reduced to writing, as follows:

"We, the undersigned, creditors of G. T. McAfee, of Talladega, Alabama, having examined into his affairs, as per his statement now exhibited, and being satisfied of his intention and desire to pay his debts in full, and that he will require time to realize on his assets, to avoid a sacrifice, do hereby agree upon the following plan of settlement: *First:* All his debts, due to northern merchants, to be placed on an equal footing, as to time and mode of payment. *Secondly:* We do hereby agree to grant an extension of time of payment, upon the amounts respectively due us, of two years from the 1st October, 1865, without the accrued interest, but including interest from 1st October, 1865, to date of payment. *Thirdly:* The real estate included in his statement, a copy

of which is hereto annexed, is understood to be held by the said G. T. McAfee in trust for the creditors signing this agreement, and, whenever the same is sold, it is hereby understood and agreed, between the said McAfee and the subscribers, that the avails, or proceeds of said sales, shall be appropriated and paid over, as soon as received, *pro rata* among the subscribers hereto, to proportion to the amounts severally due to us. *Fifthly :* This document is to be deposited with Messrs. Newlin, Fernley & Co., the largest creditors, Philadelphia, until the expiration of the extension given. A *fourth* was partly written, and then erased, in reference to interest." This instrument was dated "New York, Octo. 6, 1865," and was signed by nine mercantile firms, including the complainants in this suit; the amount of 'the debts due to each being written opposite to the name, aggregating about $4,525. Below these signatures, the following words were written: "I, the undersigned, agree to, and accept as binding, the terms of the agreement in the preceding pages, and that the property hereinbefore stated shall be faithfully held and disposed of for the purposes herein contained"; which was signed by said G. T. McAfee. A copy of this agreement was made an exhibit to the bill ; and the complainants insisted that it was an equitable mortgage, "by which a trust or lien on said real estate was created for the payment of said several debts, and said McAfee became a trustee for the purpose of selling said real estate for the payment of said debts." The bill alleged, also, that this instrument had never been recorded, because the complainants had confidence in the integrity of McAfee ; and that all the lands specified in said schedule and included in said agreement, except those sought to be reached by the bill in this case, had been sold by McAfee, and were owned by innocent purchasers for valuable consideration.

The decree in chancery, which the bill assailed as fraudulent, and sought to have vacated, was rendered under a bill filed on the 11th October, 1867, in the name of Mrs. Elizabeth L. McAfee, suing by her son, N. S. McAfee, as her next friend, against her husband, said G. T. McAfee ; and sought to make him account for the use and hire of three slaves, which Mrs. McAfee claimed under a gift from her deceased father, Nicholas Scales, and for a pecuniary legacy of $500 to her, which he had received and used; and also to fasten a trust on his lands, being the same lands sought to be reached and subjected in this case, on the ground that her money was used in paying for them. The defendant filed an answer, admitting all the material allegations of the bill. On the 12th February, 1868, the cause was submitted for decree, and the chancellor (Hon. J. K. McSpadden) made an order of refer-

ence to the register to state an account of the amount due to the complainant. The register made his report on the next day, and it was confirmed without objection. The report showed that the annual hires of the slaves, with interest, and the legacy of $500, with interest, amounted to $21,-180.58; and that the defendant was entitled to credits amounting to $9,377.64; leaving a balance in favor of the complainant, of $11,802.94. It was also referred to the register to report a suitable person as trustee for the complainant, and he reported the name of said N. S. McAfee; to which no objection was made. On the 14th February, 1868, the chancellor rendered a final decree in the cause; appointing N. S. McAfee as trustee for the complainant, and directing him to proceed to collect the trust fund due to her; divesting the legal title to the lands out of said G. T. McAfee, and vesting it in complainant; and rendering a money decree against said G. T. McAfee, in favor of N. S. McAfee as trustee, for $11,802.94. A copy of the bill in that case, and of all the proceedings had under it, and of the decree, was made an exhibit to the bill in this case, which charged that the whole proceedings were collusive and fraudulent; and the following specific allegations were made, as proving fraud: that suits were then pending against said G. T. McAfee, and Mrs. McAfee's bill was pushed with great haste to anticipate any judgments that might be rendered; that McAfee made no defense to the suit, and did not set up the agreement with his creditors now sought to be enforced; that the register's report was entirely in the handwriting of said N. S. McAfee; that the amounts allowed for hire, as shown by the report and the depositions, exceeded the highest estimate of any one of the witnesses; that interest was charged on all the items against the defendant, but not on the credits allowed him; and that no objection or exception was made to the report.

A joint and several answer was filed by all the defendants to the bill. They admitted the execution of the written agreement between G. T. McAfee and his creditors, as shown by the exhibit to the bill; but denied that it created any trust in the lands, or could operate as an equitable mortgage, and denied that McAfee had violated its stipulations. They alleged that he had sold one of the tracts of land, and had remitted $2,000 of the proceeds of sale to Newlin, Fernley & Co., for distribution among the creditors who had signed the agreement; that another tract had been sold to satisfy a prior incumbrance, which absorbed the entire proceeds of sale; and that the destruction by fire of his store-house in Talladega, with the large stock of goods contained therein, and the great depreciation in the value of real estate, had

prevented him from paying all his debts in full, and compelled him to seek relief from these debts by a discharge in bankruptcy. They denied all fraud and collusion in the chancery proceedings under the bill filed by Mrs. McAfee, and asserted as facts all the allegations contained in the bill in that case, as found by the decree. They pleaded McAfee's discharge in bankruptcy, as a bar to the complainants' debts, which were embraced in his schedule; and claimed that the house and lot on which he resided had been allotted to him as a homestead, by a decree of the District Court in bankruptcy. They demurred to the bill for want of equity, because the agreement shown by the exhibit did not create any trust or mortgage on the lands; and because the complainants' claims were shown to be barred by the discharge in bankruptcy; and because the bill showed no ground of relief as against the decree in favor of Mrs. McAfee.

The complainants took the deposition of said Green T. McAfee, whose testimony established all the facts above stated, as to his debts to the several complainants, the execution of the written agreement between him and his creditors, as shown by the exhibit, and the facts stated in his wife's bill against him; and he positively denied all the charges of fraud and collusion, and asserted the good faith of all the proceedings had in that suit. No other deposition was taken by either party. On final hearing, on pleadings and proof, the chancellor held, that the bill was to be considered as an original bill in the nature of a bill of review, impeaching the former decree for fraud; that it was necessary, under such a bill, that the circumstances of fraud should be specifically alleged, and proved as alleged; and that the complainants had failed to make out their case. He therefore dismissed the bill, and his decree is now assigned as error.

J. & J. M. Falkner, Walden & Bishop, and Thos. Henderson, for appellants.—1. The written agreement between the complainants and McAfee, their debtor, created an equitable mortgage, which will be enforced against him, or any one claiming under him, except a subsequent purchaser for valuable consideration without notice.—*M. & C. P. Railroad Co. v. Talman*, 15 Ala. 472; *Coster v. Bank of Georgia*, 24 Ala. 60; *Fash v. Ravisies*, 32 Ala. 451; *Steere v. Steere*, 5 John. Ch. 1; 1 Hilliard on Mortgages, 603.

2. These complainants are not concluded by the decree in favor of Mrs. McAfee against her husband. They were not parties to that suit, nor are they privies : as to them, it is an *ex parte* proceeding.—*McClelland v. Ridgeway*, 12 Ala. 482; *Crow v. Hudson*, 21 Aa. 561; *Crutchfield v. Hudson*, 23 Ala.

393. That suit was not a proceeding *in rem*, but *in personam* strictly.—*Br. Bank v. Hodges*, 12 Ala. 118 ; *Boykin v. Rains*, 28 Ala. 342 ; 2 Story's Eq. § 744.

3. In this case, the burden of proving the validity and amount of the debt asserted in that case rests on the parties who claim under the decree ; and they have failed to establish it. On the contrary, the record in that case shows that it was not an adversary suit—that no real defense was attempted, and that the amounts allowed exceeded the highest estimates of the witnesses. Taken in connection with the additional facts shown in this case, it is evident that suit was collusive, and was only intended to place the debtor's property beyond the reach of his creditors. It was the duty of McAfee, in defense of that suit, to have set up the equitable mortgage now asserted against him, and thus show to the court that he held the lands in trust for his creditors. It was his duty, also, to set up the defense, which the facts justified, that the rents and profits received by him were presumptively a gift.—*Roper v. Roper*, 29 Ala. 247 ; Hill on Trustees, 2 Amer. ed., m. pp. 425-6, note 1 ; McQueen on H. & W. 299 ; Clancy on H. & W. 354 ; *Methodist Church v. Jacques*, 5 John. 77 ; *Moore v. Ferguson*, 2 Munf. 421 ; *Ex parte Elder*, 2 Madd. 287, note 1.

4. McAfee's discharge in bankruptcy can have no effect on the rights of these complainants, which accrued long before the institution of the proceedings in bankruptcy. They had a right to rely on their equitable lien, and were not bound to prove their claims in bankruptcy, although they might have done so. The allotment of a homestead by the court in bankruptcy, in lands held by their debtor in trust for them, is inoperative as to them.

GEO. W. PARSONS, *contra.*—1. As a bill for equitable relief against fraud, the allegations are vague and indefinite, and do not meet the requirements of the rule, which requires certain and positive specifications of particular acts and facts. *Spence v. Duren*, 3 Ala. 251 ; *Willingham v. Harrell*, 36 Ala. 583. If the averments are sufficient, there is an entire failure to establish them by proof. McAfee himself, the only witness examined by the complainants to prove the charges of fraud, expressly denies it, and says he admitted the allegations of his wife's bill because he knew they were true. The complainants seem to expect the court to infer fraud from the facts appearing on the face of the record ; which would be violative of the rule, that fraud will never be presumed from facts which may consist with honesty and fair dealing.

*Steele v. Kinkle,* 3 Ala. 352; *Juzan v. Toulmin,* 9 Ala. 684; *Life Ins. & Trust Co. v. Pettway,* 24 Ala. 544.

2. Mrs. McAfee's suit was a proceeding *in rem,* and was notice of its pendency to all the world; and these complainants are concluded by it.—*Doe v. McGee,* 8 Ala. 570; *Bolling v. Womack,* 9 Ala. 921; *Center v. P. & M. Bank,* 22 Ala. 743.

3. If the complainants can attack this decree on the ground of fraud, they have not acted with reasonable diligence, nor disproved fault or negligence on their own part. *Hatfield v. Montgomery,* 2 Porter, 58; *Kern v. Burnham,* 28 Ala. 428; *Foster v. Gressett,* 29 Ala. 393; *French v. Garner,* 7 Porter, 553.

4. The agreement between McAfee and his mercantile creditors, set up as an equitable mortgage, has no words of conveyance, and is wanting in all the essentials of a deed. R. C. §§ 1535, 1548. It was not attested, nor proved; and it has never been recorded. It is certainly not a technical mortgage; and in ascertaining its character, and determining the intention of the parties, as shown by the instrument itself, and by the circumstances surrounding the parties, there is nothing which shows an intention to pledge the lands, or to create a trust in them. The facts simply show an embarrassed debtor at the close of the late war, owing nine mercantile firms at the north, for goods bought before the war, less than $5,000 in the aggregate, and owning lands for which he has paid more than $15,000; he desires to pay these debts, and to continue his business, without sacrificing his lands at the low prices then obtainable; and he therefore makes an exhibit of his property to his creditors, and asks indulgence. They see their debts are safe, and grant the indulgence asked; not requiring him to sell his lands, but only stipulating that, if and when he sells them, or any portion of them, the proceeds of sale shall be devoted to the payment, *pro rata,* of their respective debts. The proof shows, also, that this agreement was carried out in good faith by the debtor, remitting to his creditors the proceeds of sale of each tract sold; and that the destruction of his property by fire, and other unforeseen disasters, alone prevented the entire payment of his debts.

5. Whatever construction may be placed on this agreement, it can not override Mrs. McAfee's rights under her decree. The lien of her decree is superior to that of any unregistered mortgage, whether technical or equitable merely, of which she had no notice.—*Donald v. Hewitt,* 33 Ala. 534; *Baldwin v. Leftwitch,* 12 Ala. 838; *Carey v. Gregg,* 3 Stew. 433; *Tyrell v. Roundtree,* 7 Peters, 464; *Hervey v. Champion,* 11 Humph. 509.

6. The certificate of discharge in bankruptcy was pleaded in defense of the suit, and was a complete bar. The complainants had notice of the proceedings in bankruptcy, and their debts were provable against the bankrupt's estate. Not having attacked the discharge within two years, the complainants are now concluded by it.—Bankrupt Law, § 34; *Oates v. Parish*, 47 Ala. 157 ; 27 Maine, 69.

7. The debts due to the several complainants respectively were all barred by the statute of limitations when the bill was filed ; and it is submitted that an equitable lien or mortgage, which is a mere incident of a debt, and conveys no legal estate or title, can not be enforced after the debt is barred.

BRICKELL, C. J.—The bill is not, as was supposed by the chancellor, an original bill in the nature of a bill of review, impeaching for fraud the decree rendered in favor of Mrs. McAfee against her husband. Such a bill would properly be filed only by a party or privy to that decree, and the present complainants certainly sustain no such relation to it. The right and title of the complainants is founded wholly on the agreement into which they entered with Green T. Mc-Afee, on the 6th day of October, 1865, which is, in effect, averred to be an equitable mortgage of the lands therein mentioned, for the security of the debts due the complainants. A foreclosure of the mortgage, and a subjection of the lands to sale for the payment of the debts, is the relief prayed. The decree in favor of Mrs. McAfee is averred as the source of the title adverse to the equity of the complainants, which is set up by the defendants, and it is assailed as fraudulent. A decree may have been obtained by fraud and imposition practiced on the parties ; and if they would obtain relief against it, relief may properly be sought by an original bill in the nature of a bill of review.—Story's Eq. Pl. § 409-426. But strangers to it, who are intended to be defrauded by it, may attack it collaterally, either at law, or in equity—Bump on Fraud. Con. 509.

2. The first question arising in the case is, whether the complainants have an equitable lien, or right, or claim, on the lands described in the agreement made by them with Mc-Afee, which a court of equity will enforce. Upon that question, we cannot entertain a doubt, when the agreement is read in the light of the circumstances surrounding the parties at the time it was made. The form of the agreement is not material : operative words of conveyance are not essential to the creation of a charge, or trust, which a court of equity will enforce as a mortgage. It is the intention of the parties to charge particular property, rights of property, or credits,

with the payment of debts, which the court will regard. When that intention is deducible from their agreement, the court will give effect to it, and the equity created will prevail against all others than innocent purchasers for value.—*M. & C. P. R. R. Co. v. Talman,* 15 Ala. 473 ; *Coster v. Bank of Georgia,* 24 Ala. 37; *Donald v. Hewitt,* 33 Ala. 534.

3. The relation of debtor and creditor subsisted between the parties when the agreement was executed. The debts having matured during the war, while intercourse between the parties was impossible, interest had accumulated. The results of the war rendered it difficult for McAfee to realize from his property the means of immediate payment. A schedule of his real estate is furnished to the complainants, with a statement of the prices paid for it, and the times of its purchase. The creditors agree to relinquish all interest on their debts which accrued prior to October 1st, 1865, and to grant an indulgence of two years for the payment of their debts. It is agreed that the real estate shall be held by Mc-Afee, "in trust for the creditors signing this agreement"; and whenever it was sold, the proceeds of sale were to be appropriated to the payment of the debts. Each party was stipulating for benefits and advantages ; McAfee for the relinquishment of the interest accruing during the war, and an extension of the time of payment ; and the complainants, for security. An express stipulation of the agreement is, that the real estate shall be held *in trust* for the creditors. A trust for the creditors is expressly created, and it has every characteristic of an equitable mortgage. The cases are numerous, and many of them are referred to in *Donald v. Hewitt, supra,* in which agreements, less strong and explicit in terms, have been declared and enforced as equitable mortgages. "The maxim," said Lord Loughborough, in *Legard v. Hodges* (1 Vesey, jr. 478), "I take to be universal, that, whenever persons agree concerning a particular subject, that, in any court of equity, as against the party himself, and any claiming under him voluntarily, or with notice, raises a trust." So that the complainants stand as equitable mortgagees.

4. The subsequent bankruptcy of the mortgagor did not affect the validity or operation of the mortgage. The bankrupt act contains a saving of all liens, or mortgages, on the property, real or personal, of the bankrupt ; and equitable liens or mortgages are as much within its influence, as are legal rights.—*Parker v. Muggridge,* 2 Story, 334 ; *Fletcher v. Morey, Ib.* 555.

5. Under the statutes of exemption existing when the mortgage was made, there was no limitation on the power of the owner of land to alienate it, though it was his homestead,

[Newlin, Fernley & Co. v. McAfee.]

and there was no homestead right, which he or his wife could set up in opposition to a mortgage or alienation made by him. Whatever may have been the effect of the assignment of a homestead to the mortgagor, in the court of bankruptcy, it cannot displace or divest the lien created in favor of complainants.—Thompson on Homesteads, § 323.

6. The remaining inquiry is, whether the trustee and children of Mrs. McAfee have any right or equity, which can prevail over that of the complainants. The decree, under which they claim, is not evidence against the complainants, except to prove its existence. It has not, as is supposed by the counsel for the appellees, any of the properties, nor can it have the operation. of a decree *in rem.*—*Br. Bank of Montgomery v. Hodges,* 12 Ala. 118. It is strictly a decree *in personam,* binding on parties and privies, and evidence against them only of the facts on which it is founded, or which are involved in its rendition. As to the complainants, pre-existing creditors, having an equitable lien, the decree is not entitled to any greater operation, or any more weight or influence as evidence, than a conveyance executed by McAfee subsequent to the creation of the lien. There are many facts and circumstances, attending its rendition and its use, which indicate collusion, and an actual intent to defraud the complainants and other creditors of the husband. These can be neutralized only by clear evidence that there was a valid trust in favor of Mrs. McAfee, and a just debt due to her from the husband. The burden of proving the trust and the debt rests on the parties claiming under the decree.—*Simerson v. Br. Bank Decatur,* 12 Ala. 205.

7. The proof is full, that she owned slaves in her own right, the hires or profits of which were taken by her husband, through a period of more than twenty years. It is well settled, that when a wife, having an equitable separate estate, and living with her husband, permits him to receive and use in his own business the rents and profits of such estate, the presumption of a gift to him arises.—Hill on Trustees, 641; 1 Bish. Mar. Women, § 820; *Roper v. Roper,* 29 Ala. 247; *Methodist Church v. Jacques,* 3 John. Ch. 77. This presumption prevails, as between husband and wife, and as between their personal representatives. The reason, or, rather, the necessity of it, is very forcibly expressed by TILGHMAN, C. J.: "It is a general principle, that where the wife permits the husband to receive the profits of her separate estate, and particularly where they live together, and the expenses of housekeeping are paid by him, the presumption is, that it was the intention of the wife to make a gift of the profits to the hus-

band. And there is great reason for this presumption; because the husband, being in the receipt of this money, may be induced to live at a greater expense than he would otherwise have done, whereby the comforts of his wife, as well as his own, are increased. To call him to account, therefore, after the lapse of a number of years, might be ruinous, and would certainly be unjust."—*McGlinsey's appeal*, 14 S. & R. 64. The ruinous consequences, and the injustice which would result, this case illustrates. The hires of four slaves, for a period of twenty-four years, with accumulating interest, exceed twenty thousand dollars; for which a decree was rendered. The wife was maintained, the children reared and educated by the husband; for which, of course, no compensation is, or could legally be, allowed him. A small separate estate of the wife could soon, in this way, consume a large estate of the husband's, reducing him to insolvency.

The wife is entitled to the rents and profits of her equitable estate, and may prevent her husband from receiving them. By her express dissent, or by express agreement with him, she may render him liable to account for them. But, if she does not dissent, nor require an express promise from him to account, the presumption of a gift must prevail. When a controversy arises between the wife and the creditors of the husband, especially after the lapse of many years, while the husband is engaged in mercantile pursuits, in the course of which credit may have been extended him on the faith of the presumption, the proof to repel it should be clear and convincing. There is no evidence that Mrs. McAfee ever dissented to the hiring of the slaves by her husband, or to his reception of the hires. The evidence is that she assented to it; and while the husband says she sometimes requested him to render her an account of the hires, it is not said that he had previously promised her to account for them. We cannot declare that Mrs McAfee had any valid claim against her husband for the hire of these slaves.

The legacy of five hundred dollars was the separate property of Mrs. McAfee; and for the principal of it the husband was bound to account. What rights Mrs. McAfee, or her trustee, could acquire as judgment creditors, as to this sum, it is not necessary to consider. Notice of the mortgage to the complainants is not denied; and a want of notice would be indispensable to give them any right, which could be preferred to the older equity of the complainants.

The decree of the chancellor must be reversed, and the cause remanded, with directions that a decree be rendered

[Jones' Adm'r v. Crews.]

declaring the complainants have a lien on the real estate described in the bill, and ordering a sale thereof for the payment of the debts mentioned in the agreement of October 6th, 1865. The costs of this appeal, and the costs of the Court of Chancery, must be paid by the respondents who have appeared and answered.