In the Matter of John W. GREENE, Debtor.

John W. Greene, Plaintiff,

v.

The Associates, Defendant.

Bankruptcy No. 99–04505–TBB–13. Adversary No. 99–00282.

United States Bankruptcy Court, N.D. Alabama, Southern Division.

May 18, 2000.

584

Jeffery Van Hood, Bessemer, Al, for plaintiff.

Marvin E. Franklin, Birmingham, Al, for defendant.

### Memorandum Opinion

THOMAS B. BENNETT, Bankruptcy Judge.

### I. Equivalency or Inequality, Binding or Not

Sometimes our system of common law jurisprudence fails. Sometimes there is one reason for its failure and only a few individuals are adversely impacted. Other times a fusion results in erroneous precedent with far reaching consequences affecting numerous people. This matter involves the last of these and requires this Court to consider whether a holding of a higher court controls the outcome of this matter. If *stare decisis* mandates that that set forth in *Charles R. Hall Motors, Inc. v. Elgin Lewis,* 137 F.3d 1280 (11th Cir.), *reh'g. denied en banc,* 149 F.3d 1197 (1998) governs, the debtor in this case will be one more of what is an ever increasing number who have been and continue to be denied what the laws of the United States and those of Alabama provide for them. This is because—and there is no subtle way to say this—the *Hall Motors* precedent is wrong in its holding on what property interest a defaulted debtor retains in a motor vehicle under Alabama law following its repossession, but before its sale. It is also due to ramifications of broader scope: the undoing in Alabama by *Hall Motors* of statutes having nationwide application, one federal and the other the law of secured transactions under Article 9 of the Uniform Commercial Code.

A component of what this Court must consider to reach a resolution of the legal issues before it is whether the law as applied to the facts in *Hall Motors* (i) binds this Court because of an equivalency to this adversary proceeding, or (ii) is not applicable due to an inequality in the deci-

sional equation. Should there be appropriate fact variation and/or law deviation, *stare decisis* may not require this Court to follow the *Hall Motors* holding. This is the precedential aspect of *Hall Motors* which this Court is obligated to critically, though respectfully, scrutinize as part of its task of resolving legal issues arising from facts which appear as an equivalency, but are in reality an inequality.

## II. The Greene Facts

On September 6, 1996, John Greene purchased for his personal use a 1994 Ford Mustang (the Mustang) from Jim Skinner Ford, Inc. for $15,002.13. A portion of the purchase price was financed by Jim Skinner Ford, Inc. The terms of the purchase and the financing of a portion of the purchase price are set forth in the "Retail Installment Contract and Security Agreement" dated September 6, 1996, by and between John W. Greene and Jim Skinner Ford, Inc. (hereinafter sometimes the Mustang Contract). Jim Skinner Ford, Inc. then assigned all of its interests in and to the contract to Transouth Financial Corporation which has been represented to this Court by counsel for The Associates and by a witness called by The Associates to now be The Associates.

The contract between Mr. Greene and The Associates evidences, among other things, the terms of repayment of Mr. Greene's debt and that The Associates received as collateral securing repayment of the note a security interest in the Mustang. It is uncontested that The Associates perfected its security interest by having its lien recorded on the certificate of title issued to Mr. Greene as the owner and holder of legal title. The certificate of title for the Mustang was at all relevant times in the possession of The Associates.

Additionally, there is not in the Mustang Contract any provision for retention of title, right of possession pre-default, or transfer of ownership of the vehicle to The Associates as the assignee of the seller's interest. Under the Mustang Contract's terms, The Associates obtained only a security interest. This is the wording:

**SECURITY INTEREST:** You give us a security interest in the vehicle and the goods being purchased which are de-

scribed above. The security interest extends to all proceeds of and accessions to such vehicle and goods. You also assign to us any proceeds not in excess of the unpaid balance under this contract which may become payable through insurance on the property or written in connection with this contract, including returned or unearned premiums.

By July, 1999, The Associates contended that Mr. Greene was in default under the terms of the Mustang Contract. Accordingly on July 27, 1999, it exercised its rights under the Mustang Contract and Alabama's Uniform Commercial Code and (i) repossessed the Mustang, and (ii) sent Mr. Greene a notice of private sale.

John Greene's response was to file (i) his petition in bankruptcy seeking relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301 *et seq.*, and (ii) this adversary proceeding seeking the turnover of the Mustang under § 542 of the Bankruptcy Code, 11 U.S.C. § 542, and a determination that The Associates violated the automatic stay of § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a) (the Greene Adversary Proceeding). Fearing a sale of the Mustang, Mr. Greene's bankruptcy petition was filed on an emergency basis without all the required schedules and the statement of financial affairs, among other documentation. A hearing was held by this Court on the deficiencies in the filing of mandated schedules which was not attended by either Mr. Greene or his counsel. On August 26, 1999, Mr. Greene's case was dismissed for his failure to file the required documents. Based on a motion filed August 29, 1999, to reconsider the dismissal, the order dismissing Mr. Greene's Chapter 13 case was vacated due to this Court's clerk not having properly served notice of the hearing on dismissal.

The parry to the Adversary Proceeding is The Associates' motion to dismiss. During hearings held on two occasions, The Associates presented evidence in the form of testimony and documents regarding the

how and when of the sale of the Mustang, its repossession, and its resale. An employee of The Associates testified that the Mustang was sold August 26, 1999. However, there has not been sufficient evidence to enable this Court to establish whether the sale was before or after entry of the now set aside order of dismissal.[1] At a subsequent hearing held on this matter, The Associates called as a witness the general manager of Cleveland Auto Sales which had sold the Mustang for The Associates. His testimony and the documentary evidence presented through him is that the bill of sale for the Mustang was dated August 30, 1999, and that the sale was not by public auction. Rather, five (5) bids for the purchase of the Mustang had been received by Cleveland Auto Sales over an unspecified period of time. Cleveland Auto Sales sold the Mustang for $3,650.00 to a third party. The date of the sale set by The Associates employee at the Court's first hearing and the different one asserted at the second by use of the bill of sale were not reconciled by The Associates. Because of this evidence and other matters presented which go beyond the pleadings, The Associates' motion to dismiss is treated as one for summary judgment under Fed.R.Civ.P. 56. *See* Fed.R.Civ.P. 12(b) & (c); *Garcia v. Copenhaver, Bell & Assoc., M.D's, P.A.,* 104 F.3d 1256, 1266 n. 11 (11th Cir.1997); *Jones v. Automobile Ins. Co. of Hartford, Conn.,* 917 F.2d 1528, 1532 (11th Cir.1990); *Marine Coatings of Ala., Inc. v. United States of America,* 792 F.2d 1565, 1567 (11th Cir.1986).

The reasons The Associates believes it is entitled to summary judgment are that (i) no stay under § 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a), existed to prevent the sale of the Mustang and (ii) under the authority of *Hall Motors,* Mr. Greene did not have any interest in the Mustang at any time during which the Chapter 13 case has been pending. The asserted result is that the vehicle has never been property of Mr. Greene's bankruptcy estate and his only interest is a right of redemption under Alabama's version of the Uniform Commercial Code, Ala.Code § 7-9-506 (1997). In order to understand why (i) The Associates' motion is malapropos, (ii) *Hall Motors* is bad law, and (iii) *Hall Motors* is not binding precedent in this case, one must first know the requisites of a turnover request and a stay violation under the Bankruptcy Code conjoined with how Alabama law treats the sale of motor vehicles and what rights a defaulting debtor has, if any, in a repossessed motor vehicle. This requires resort to (i) the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.,* and (ii) Alabama's version of the Uniform Commercial Code and knowing how this statute treats trust receipts, chattel mortgages, conditional sales agreements, and similar title retention devices which purport to have title to goods held by one other than a debtor.

### III. The Perimeters of the Dismissal Request

#### A. *Turnover, Stay Violation and Property or Not*

To determine whether Mr. Greene may obtain turnover of the Mustang under § 542 of the Bankruptcy Code, 11 U.S.C. § 542, or whether its sale by The Associates violated the automatic stay imposed under § 362 of the Bankruptcy Code, 11 U.S.C. § 362, one needs to read the explicit language of Alabama's Uniform Commercial Code, Ala.Code §§ 7-1-101 *et seq.* (1997), in conjunction with the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* For purposes of turnover under § 542, the property must be that of the bankruptcy estate as defined under § 541 of the Bankruptcy Code. As of the filing of his bankruptcy case, Mr. Greene must have had a right to use, sell, or lease this property. Lastly,

---

1. This occurred before the December 1, 1999, effective date of a change in Federal Rule of Bankruptcy Procedure 9014 which now, unless otherwise ordered, excepts such a dismissal from the Fed.R.Bankr.P. 7062 stay of ten (10) days from the effective date of such an order.

the interest of The Associates in the property, upon request, is to be adequately protected. *See* 11 U.S.C. §§ 362(c)–(f), 363(b) & (d), 541 & 542(a); *Hall Motors,* 137 F.3d at 1282; *Capital Factors, Inc. v. Empire for Him, Inc. (In re Empire for Him, Inc.),* 1 F.3d 1156, 1160 (11th Cir. 1993). For determination of a violation of the automatic stay by The Associates, the inquiry includes ascertaining, among other items, whether the Mustang was property of the estate or property in the possession of Mr. Greene, and, if so, whether it was disposed of by The Associates without the automatic stay being terminated, annulled, or otherwise modified. *See* 11 U.S.C. § 362; *see e.g., Soares v. Brockton Credit Union,* 107 F.3d 969 (1st Cir.1997).

The arguments presented by The Associates in support of its motion are premised on whether the Mustang has ever been property of Mr. Greene's bankruptcy estate. With respect to one, it argues its sale occurred after Mr. Greene's case had been dismissed. As a consequence of the dismissal and at the time of the Mustang's sale, The Associates asserts no bankruptcy estate existed. Thus, it contends that no stay violation could have occurred. On this aspect of The Associates' motion, its own evidence is in conflict and a clear factual inference exists that the disposition of the Mustang may have commenced, if not been finalized, before the dismissal on August 26, 1999. As a consequence, no further consideration of this argument is necessary. It fails at this time. *See Allison v. McGhan Medical Corp.,* 184 F.3d 1300 (11th Cir.1999); *Arrington v. Cobb County,* 139 F.3d 865, 875 (11th Cir.1998); *Warrior Tombigbee Trans. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296–1297 (11th Cir.1983).

The Associates' other position is the *Hall Motors* decision is dispositive of whether the Mustang was property of Mr. Greene's bankruptcy estate. The Associates argues that under the *Hall Motors* holding the Mustang never was property of Mr. Greene's bankruptcy estate. This

arises from his pre-petition default which resulted, The Associates posits by reliance on *Hall Motors,* with legal title to and the right to possession of the Mustang vesting absolutely in it. Therefore, The Associates concludes that following repossession of the Mustang no other property interest in it could be held by Mr. Greene.

 Under 11 U.S.C. § 541(a)(1), property of the estate includes "all legal or equitable interests of the debtor as of the commencement of the case." 11 U.S.C. § 541(a)(1). This Bankruptcy Code definition of "property of the estate" is far more inclusive of property interests of a debtor than was true under the predecessor statute's, the Bankruptcy Act's, comparable provision of "property of the debtor." The Bankruptcy Act of 1898 §§ 69, 70, 11 U.S.C. §§ 109, 110 (1938); *see Fruehauf Corp. v. Yale Express Sys., Inc. (In re Yale Express Sys., Inc.),* 370 F.2d 433 (2nd Cir.1966). Whether the Mustang is property of Mr. Greene's bankruptcy estate is a question of federal law. *Hall Motors,* 137 F.3d at 1283; *Southtrust Bank of Alabama, N.A. v. Thomas (In re Thomas),* 883 F.2d 991, 995 (11th Cir.1989). This federal law question is complicated by the nature and existence of Mr. Greene's right to property having to be determined by reference to state law, here Alabama's. *See Hall Motors,* 137 F.3d at 1283; *Thomas,* 883 F.2d at 995.

This is why the *Hall Motors* court turned to Alabama law to see if the motor vehicle involved was property of Elgin Lewis' bankruptcy estate. Unfortunately, the United States Court of Appeals for the Eleventh Circuit was presented only Alabama law issues which had been framed by the contesting parties in terms of the wrong Alabama law, and either (i) a sparsity of relevant facts, or (ii) some agreed state of facts which disguised the true nature of the issues from the appellate court.

At a minimum, what is disclosed by the briefs of counsel for the parties in *Hall Motors* is that they failed to met their

obligation to tell the appeals court of conflicting law and authority. In the federal court system which is one of general jurisdiction on the appeals level, this type of disclosure is all the more important. In part, here is what appears to have happened. The Eleventh Circuit, as had been the District Court judge, was directed by Hall Motors' attorney to utilize Alabama court decisions on conversion to decide issues of law under Alabama's Uniform Commercial Code. In reliance on this, the Eleventh Circuit panel sets forth in its *Hall Motors* opinion that its use of Alabama's law of conversion to ascertain what interest Elgin Lewis had in the repossessed motor vehicle arose because it had not located contrary Alabama law regarding what Mr. Greene's interests in the Mustang were, if any, under Alabama's Uniform Commercial Code and that Alabama's courts appeared to have reconciled the law of conversion with Article 9 of its Uniform Commercial Code. *Hall Motors,* 137 F.3d at 1283–1284.

### B. *The Problem—Hall Motors' Conversion Law*

Although the Eleventh Circuit cites four (4) Alabama court opinions and one of the United States Court of Appeals for the Fifth Circuit as dealing with Alabama's law of conversion, *Huntsville Golf Dev., Inc. v. Ratcliff, Inc.,* 646 So.2d 1334 (Ala. 1994); *Roberson v. Ammons,* 477 So.2d 957 (Ala.1985); *Pierce v. Ford Motor Credit Co.,* 373 So.2d 1113 (Ala.Civ.App. 1979); *Am. Nat'l Bank & Trust Co. of Mobile v. Robertson,* 384 So.2d 1122 (Ala. Civ.App.1980); *Thompson v. Ford Motor Credit Co.,* 550 F.2d 256 (5th Cir.1977), it apparently failed to observe that the opinions of these courts were premised on the Alabama law governing legal mortgages, including chattel mortgages, which must be distinguished from Alabama's law on equitable mortgages. To learn why this is so necessitates that one read the conversion cases cited in the *Hall Motors* opinion—*Huntsville Golf, Roberson, Pierce, American National Bank,* and *Thompson,*

then read the underlying, earlier Alabama conversion cases which are cited in and form the basis of the conversion holdings in *Pierce, American National Bank,* and *Thompson.* The underlying cases are *Rainey v. Ford Motor Credit Co.,* 294 Ala. 139, 313 So.2d 179 (1975); *Automotive Acceptance Corp. v. Powell,* 45 Ala.App. 596, 234 So.2d 593 (Ala.Civ.App.1970); and *Harmon v. Dothan Nat'l Bank,* 186 Ala. 360, 64 So. 621 (1914). Next, one must realize that *Rainey, Automotive Acceptance,* and *Harmon* recite Alabama's pre-Uniform Commercial Code law governing mortgages at law and that they are not dispositive of the issue of whether a debtor has a property interest in collateral after his or her default under the terms of a secured obligation governed by the Uniform Commercial Code. Finally, one should ascertain that *Roberson* and *Huntsville Golf* were not decided under and the Alabama court did not mention the Uniform Commercial Code. *Huntsville Golf,* 646 So.2d at 1334–1337; *Roberson,* 477 So.2d at 959–963. More detail on this is presented later.

■ But for *Hall Motors,* none of this need be considered to know why under Alabama's Uniform Commercial Code a defaulting debtor, before the occurrence of either a sale or other disposition of collateral under Ala.Code §§ 7–9–504, 506 (1997), possesses a property interest in the collateral securing repayment of the defaulted obligation. All that should occur is that one read the relevant sections of Articles 1, 9, and 10 of Alabama's Uniform Commercial Code, Ala.Code §§ 7–1–101 *et seq.,* and each's official commentary. To know what Alabama's Uniform Commercial Code specifies facilitates understanding why *Hall Motors* is not dispositive of The Associates' claimed entitlement to judgment against Mr. Greene and Alabama's law on the subject. Furthermore, this knowledge may forestall repetition of what happened in the decisional process which resulted in certain of the *Hall Motors* rulings. For these reasons, this

Court will initially discuss what Alabama's Uniform Commercial Code allows a secured party to obtain from a debtor for Article 9 purposes and what it does not.

### IV. The Uniform Law—Alabama's Is No Different

#### A. *The UCC's Application*

##### (1) *The Anatomy*

Neither Greene, nor The Associates oppose Article 9 of Alabama's Uniform Commercial Code's governance of the security interest aspects of the transaction by which Mr. Greene financed the purchase of the Mustang. Indeed, Ala.Code § 7–9–102(1)(a) (1997)'s language specifies that it governs "any transaction (regardless of its form) which is intended to create a security interest in personal property...." Ala. Code § 7–9–102(1)(a) (1997). Section 7–9–105(1)(*l*) defines a "security agreement" to mean "an agreement which creates or provides for a security interest." Ala.Code § 7–9–105(1)(*l*) (1997). Section 7–9–105(1)(h) delineates that "'[g]oods' includes all things which are moveable at the time the security interest attaches ...", Ala.Code § 7–9–105(1)(h) (1997), and section 7–9–109(1) classifies goods as "'[c]onsumer' goods if they are used or bought for use primarily for personal, family or household purposes." Ala.Code § 7–9–109(1) (1997).

Given the facts of this case, it is apparent that Article 9 of the Alabama Uniform Commercial Code is the relevant and applicable law to use to ascertain the interests, rights, and remedies of both Mr. Greene and The Associates vis-a-vis the Mustang. It also is clear that under Alabama's version of Article 9, the Mustang is a consumer good which is the subject of a security agreement as defined by Alabama's statute.

The result is other portions of Article 9 have application to the Greene—The Associates transaction. These include Ala. Code § 7–9–103 governing perfection and the effect of perfection or non-perfection of a security interest. What section 7–9–103(1)(a) of the Uniform Commercial Code provides for is that perfection of a security interest in goods covered by a certificate of title is not determined by that part of section 7–9–103(1) dealing with ordinary goods. Instead, section 7–9–103(2) governs perfection when a certificate of title is issued under a statute of Alabama or another jurisdiction requiring that the security interest be shown on the certificate of title as a condition precedent to perfection of the security interest. Ala.Code § 7–9–103(1)(a) & (2)(b) (1997). Then § 7–9–103(2)(b) makes perfection and the effect of perfection or non-perfection of a security interest governed by the law of the jurisdiction issuing the certificate of title until a point in time after the goods are removed from the jurisdiction which issued the certificate of title or the goods are registered in another jurisdiction. Ala. Code § 7–9–103(2)(b) (1997).

In this instance, in 1973, Alabama enacted its motor vehicle registration statute, the Uniform Certificate of Title and Anti-Theft Act, Ala.Code §§ 32–8–30 *et seq.* (1999), requiring that for motor vehicles designated as 1975 models and subsequent model year motor vehicles, perfection of the lien or other security interest must be by having it noted on the certificate of title for vehicles required to be titled. Ala. Code §§ 32–8–30(a), 61(b) (1999). It is noteworthy that what is perfected under this uniform motor vehicle statute is a security interest. Ala.Code § 32–8–61 (1999). Between Greene and The Associates, the perfection of a security interest in the Mustang is not disputed.

Next, Alabama law grants a secured party such as The Associates the right, unless otherwise agreed, to take possession of its collateral on default. Ala.Code § 7–9–503 (1997). Then sections 7–9–504 and 7–9–505 delineate the methods by which a secured party is to dispose of the collateral after default. In general, section 7–9–504(1) provides for the sale, lease or other disposal of collateral following a

debtor's default, Ala.Code § 7–9–504(1) (1997), and the disposition of the collateral may be by public or private proceeding, Ala.Code § 7–9–504(3) (1997). Section 7–9–505 details a secured party's compulsory disposition of collateral. In certain instances, it allows a secured party to retain the collateral in satisfaction of the debtor's obligation. *See* Ala.Code § 7–9–505(1) & (2) (1997). This is the Uniform Commercial Code's equivalent to what is known as strict foreclosure. In other cases, it mandates a secured party dispose of its collateral under section 7–9–504. *See* Ala.Code § 7–9–505(1) (1997).

■ In this Greene–The Associates fight, the evidence is that The Associates made a disposition of its collateral, the Mustang, under section 7–9–504. Section 7–9–504(4) sets forth

(4) When collateral is disposed of by a secured party after default, *the disposition transfers to a purchaser for value all of the debtor's rights therein,* discharges the security interest under which it is made and any security interest or lien subordinate thereto. *The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this part or of any judicial proceeding ...*

Ala.Code § 7–9–504(4) (1997) (emphasis added). What this subsection of Alabama's Uniform Commercial Code provides is that the secured party's disposition of collateral after default by a debtor is *the event* which cuts off the debtor's rights and interests in the collateral! It is not until after a disposition under § 7–9–504 or § 7–9–505 that the debtor may be held to no longer have any property interest in the collateral under Alabama's Uniform Commercial law. To argue or hold otherwise is to disregard the clear language of Alabama Code § 7–9–504(4) (1997).

(2) *All One Gets Is A Security Interest— Buttressed By Comment, History, Application and Definition*

That this is Alabama's law on when a debtor's property interest in collateral is extinguished is reinforced by other sections of its Uniform Commercial Code and a line of decisions of United States Courts of Appeals dealing with the precise issue faced in *Hall Motors* and by this Court. The Uniform Commercial Code sections are within Articles 1 and 9. Two sections are in Article 9. By far the simplest, yet most important to resolution of Alabama's law is a definition set forth in Article 1. Within Article 9, the corollary to this point of termination of a debtor's interest in collateral is set forth. That which the corollary provides is made irrefutable by the commentary and history.

(a) *Article 9 Again—The Comment*

One of these other Article 9 sections is § 9–202. It is aptly captioned "Title to collateral immaterial." Contained in § 9–202 is this language: "[e]ach provision of this article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." The Official Comment following § 9–202 is

The rights and duties of the parties to a security transaction and of third parties are stated in this article without reference to the location of 'title' to the collateral. *Thus the incidents of a security interest which secures the purchase price of goods are the same under this article whether the secured party appears to have retained title or the debtor appears to have obtained title and then conveyed it or a lien to the secured party.* This article in no way determines which line of interpretation (title theory v. lien theory or retained title v. conveyed title) should be followed in cases where the applicability of some other rule of law depends upon who has title. Thus if a revenue law imposes a tax on the 'legal' owner of goods or if a corporation law makes a vote of the stockholders prerequisite to a corporation 'giving' a security interest but not if it acquires property 'subject' to a securi-

ty interest, this article does not attempt to define whether the secured party is a 'legal' owner or whether the transaction 'gives' a security interest for the purpose of such laws. Other rules of law or the agreement of the parties determine the location of 'title' for such purposes.

*Petitions for reclamation brought by a secured party in his debtor's insolvency proceedings have often been granted or denied on a title theory: where the secured party has title, reclamation will be granted; where he has 'merely a lien', reclamation may be denied. For the treatment of such petitions under this article, see Point 1 of Comment to Section 7–9–507.*

Ala.Code § 7–9–202 official comment (1997).

By following the suggestion set forth in the Official Comment to § 9–202 to see point 1 of the Official Comment to § 9–507, one will discover that the drafters of the Uniform Commercial Code were aware of the title versus lien disparate treatment of a debtor's and secured party's interests in collateral under the pre-Uniform Commercial Code laws and courts' holdings in the various states. It further reveals that these technical distinctions were rejected by the drafters so consistency in outcome among the various jurisdictions adopting the Uniform Commercial Code would be achieved. This is how this is expressed in the Official Comment to Ala.Code § 7–9–507 (1997):

A case may be put in which the liquidation value of an insolvent estate would be enhanced by disposing of all the debtor's property (including that subject to a security interest) in the liquidation proceeding and in which, if a secured party repossesses and sells that part of the property which he holds as collateral, the remainder will have little or no resale value. In such a case the question may arise whether a particular court has the power to control the manner of disposition, although reasonable in other respects, in order to preserve the estate for the benefit of creditors. Such a power is no doubt inherent in a federal bankruptcy court, and perhaps also in other courts of equity administering insolvent estates. *Traditionally it was not exercised where the secured party claimed under a title retention device, such as conditional sale or trust receipt.* See *In re Lake's Laundry, Inc.*, 79 F.2d 326 (2d Cir.1935) and the remarks of Clark, J., concurring, in *In re White Plains Ice Service, Inc.*, 109 F.2d 913 (2d Cir.1940). *It has been held that distinctions in results based on these distinctions in form have been made obsolete by this article. In re Yale Express System, Inc.*, 370 F.2d 433 (2d Cir.1966), 384 F.2d 990 (2d Cir.1967).

Ala.Code § 7–9–507 official comment (1997) (emphasis added).

### (b) *Throwing Out Lake's Laundry— The History*

In point of fact, the quoted portion of part 1 to the Official Comment to 7–9–507 is an understatement. The very court which used the concept of "title" to grant a creditor's request for reclamation under the Bankruptcy Act, the United States Court of Appeals for the Second Circuit in *In re Lake's Laundry, Inc.*, 79 F.2d 326 (2d Cir.), *cert. denied sub nom. Lake's Laundry v. Braun*, 296 U.S. 622, 56 S.Ct. 144, 80 L.Ed. 442 (1935), repudiated its 1935 *Lake's Laundry* ruling that property sold under a conditional sales contract was not property of the debtor/bankrupt and as a result not the subject matter of the reorganization case. This occurred some thirty-one years after *Lake's Laundry* in *Fruehauf Corp. v. Yale Express Sys. (In re Yale Express Sys., Inc.)*, 370 F.2d 433 (2d Cir.1966).[2] The basis of the repudia-

---

**2.** This title based holding of *Lake's Laundry* was made under the pre-Chandler Act version of the Bankruptcy Act of 1898. As originally enacted, its conception of what property was brought into a bankruptcy case was determined by reference to § 70a of the Bankrupt-

tion may not be stated more precisely than by quoting a portion of Judge Irving Kaufman's opinion:

> Perhaps the distinction drawn by the majority in *In re Lake's Laundry* between conditional sales agreements and other security arrangements, was defensible at the time, in light of the important consequences that the various commercial laws of the states attached to the particular form of the security agreement. But the body of commercial law has not stood still. It has made great and progressive strides, and 47 states, the District of Columbia, and the Virgin Islands have now enacted the Uniform Commercial Code. Section 9–202 declares the policy of Article 9 of the Code stating that 'each provision of this Article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor.' In short, it does not matter whether the security agreement is in the form of a chattel mortgage or a conditional sales contract. In either case, the secured party has the right upon default by the debtor to take possession of the collateral (§ 9–503) and to sell, lease or otherwise dispose of it, applying the proceeds to the indebtedness (§ 9–504).

> \* \* \* \* \* \*

The "Official Comments" of the Code are, of course, not binding on a federal court which is in the process of exercising its equitable discretion in a reclamation proceeding. But, they are powerful dicta for the Code is 'well on its way to becoming a truly national law of commerce,' and is, therefore, as we have noted, a most appropriate source of federal law. *United States v. Wegematic,* 360 F.2d 674, 676 (2d Cir.1966). We would indeed be myopic if we failed to recognize the revolution in commercial law that the Uniform Commercial Code has occasioned in the states. It would be incongruous for the federal courts, historically the leaders in the development of the law, to continue to employ anachronistic distinctions to determine whether a creditor is entitled to redeem property held by the trustee when the overwhelming number of states have succeeded in bringing their laws more into line with commercial reality. The Court of Appeals for the Third Circuit recently recognized the enlightened teachings of the Uniform Commercial Code:

> The Uniform Commercial Code was designed to bring the body of commercial law into the contemporary world of business. \*\*\* It would hardly be consistent with that design \*\*\* to reestablish in new form limitations which reflect a passion for legal technicality over commercial reality. \*\*\* The Code has eliminated the older, technical and restricted categories of security agreements. Gone are the definitional difficulties and transactional fictions of the chattel-mortgage, the conditional sale, the trust receipt. In their stead is a general set of rules for the creation of a security interest in the secured party. (*In the Matter*

---

cy Act of 1898's "Title to Property." Under section 70a, the trustee of a bankrupt was vested with "the title of the bankrupt." as of the date one was adjudicated a bankrupt. Bankruptcy Act of 1898, § 70a, 30 Stat. 544 (1898). Later the demarcation date for what property of a bankrupt was brought into a bankruptcy case was altered to the date of filing of the bankruptcy petition. *Compare* 30 Stat. 544 (1898); 52 Stat. 840 (1938); 53 Stat. 1134 (1939). When one reads *Lake's Laundry* and *Yale Express,* one must discriminate between the two uses of title in these

opinions and subsequent ones following *Yale Express.* The distinction made sometimes appears in this fashion. When title to property was held by one other than a bankrupt, it was not considered "property of the debtor" and was not part of the subject matter of the reorganization. *See Yale Express,* 370 F.2d at 435–436. Under the Bankruptcy Act, the search was usually for who held title by reference to a state's laws to see if property was for Bankruptcy Act purposes "property of the debtor" which would vest in the trustee.

*of United Thrift Stores, Inc.,* 363 F.2d 11, 14 (3 Cir.1966))

We, therefore, in keeping with the developments in the body of recent commercial law, conclude that Fruehauf's right to reclaim the trailers and truck bodies cannot hang on whether its security agreement is labeled a 'conditional sales contract' or a 'chattel mortgage.' *Since the Uniform Commercial Code has abolished the technical distinctions between the various security devices, the federal bankruptcy courts should no longer feel compelled to engage in the purely theoretical exercise of locating 'title'; nor should considerations of where 'title lies' influence the courts in the exercise of their equitable discretion.* Rather, the bankruptcy courts should assume their proper equitable function of scrutinizing the particular circumstances surrounding each petition for reclamation, in order to arrive at a just determination. *Equitable considerations and the substance of the transaction should govern, regardless of the form of the security agreement.*

*Yale Express,* 370 F.2d at 436–438 (footnotes omitted and emphasis added).

As important to this Court as the legal basis on which the Second Circuit rejected its *Lake's Laundry* title based holding are the facts of *Yale Express.* In *Yale Express,* the secured creditor, Fruehauf Corporation (Fruehauf), sought reclamation of fifty (50) trailers and sixty-two (62) truck bodies which Fruehauf had sold on credit to Yale Express. Yale Express secured its debt to Fruehauf through the vehicle of chattel mortgages for the truck bodies and trailers with liens being perfected in accordance with the New York Uniform Commercial Code. Yale Express filed bankruptcy and then defaulted on its payment obligations to Fruehauf. To obtain possession of its collateral and to be able to dispose of it, Fruehauf filed a petition for reclamation in Yale Express' Chapter X case. *Yale Express,* 370 F.2d at 435. In reversing the District Court's denial of Fruehauf's reclamation demand, the Second Circuit recognized that who held "title" to collateral was irrelevant for determination of whether the truck bodies and trailers were "property of the debtor" under the Bankruptcy Act—remember it was a definition of property more restrictive than that under § 541 of the Bankruptcy Code, 11 U.S.C. § 541—and whether Yale Express held on default an interest in the truck bodies and trailers under New York's Uniform Commercial Code. *Yale Express,* 370 F.2d at 437–438. The answer to both required application of what was the then relatively new Uniform Commercial Code.

■ The import of the facts and the holding of *Yale Express* is beyond cavil: following default and before disposition of the collateral by a secured party, the interest of a debtor in collateral securing the performance due a secured party is not determined by reference to title being in or possession being held by a secured party. Rather, Article 9 treats the secured party, regardless of the form of the transaction, as having *only* a security interest. In other words, the secured party before disposition of the collateral is deemed under the Uniform Commercial Code to have only an interest in the collateral to the extent that it secures repayment or other performance of an obligation. It is the property interests in the collateral remaining those of the debtor which when coupled with the security interest aggregate what are all of the property interests making up what is the collateral. More simply, the Uniform Commercial Code treats the debtor as retaining a property interest in the collateral until its disposition under either § 9–504 or § 9–505.

The *Yale Express* court's holding was based in part on a portion of the opinion of the United States Court of Appeals for the Third Circuit in *Redisco, Inc. v. United Thrift Stores, Inc. (In the Matter of United Thrift Stores, Inc.),* 363 F.2d 11 (3rd Cir.1966). In *Redisco,* trust receipts—a pre-Uniform Commercial Code method of

financing whereby title to goods sold passes directly from the seller to the purchaser's lender who then delivers the goods absent title to the buyer—were determined to be security agreements creating a security interest under New Jersey's Uniform Commercial Code. *Redisco,* 363 F.2d at 14. In doing so, the *Redisco* court delineated that:

> The Code has eliminated the older, technical and restricted categories of security agreements. Gone are the definitional difficulties and transactional fictions of the chattel-mortgage, the conditional sale, the trust receipt. In their stead is a general set of rules for the creation of a security interest in the secured party.

*Redisco,* 363 F.2d at 14.

The *Redisco* court's conclusion is consistent with that of the Second Circuit in *Yale Express:* the pre-Uniform Commercial Code practice of retaining title in the seller or transferring it to a lender or other third person, non-buyer, is of no moment. The location of title to property and reference to a state's pre-Uniform Commercial Code laws do not determine what interests in property constituting collateral and rights associated therewith that a secured party and a debtor have under Article 9 of the Uniform Commercial Code.

Decades ago, the conclusions of the *Redisco* and *Yale Express* courts were recognized as correct by other United States Courts of Appeals. In 1972, the Ninth Circuit decided that

> The basic premise of RCA's argument is that property sold under a security agreement, such as that here involved, permitting a vendor to retain title to goods delivered into the possession of a buyer, is not to be included among the buyer's assets if he becomes bankrupt. *Although such a contention is not supportable if an agreement is governed by the Uniform Commercial Code,* [FN3] it finds support in the provisions of the Uniform Conditional Sales Act (U.C.S.A.) which was in effect in Arizona

when the contract between RCA and TV was made.

> FN3. *The Uniform Commercial Code expressly denies the importance of the purported location of "title" in determining contractual rights (§ 9–902); hence, property sold under agreements governed by the Code are subject to the jurisdiction of District Courts in bankruptcy actions. See In Re Yale Express System, Inc.,* 370 F.2d 433, 436–437 (2d Cir.1966).

*RCA Corp. v. Altschul (In re Spanish Language Television of Ariz., Inc.),* 456 F.2d 159, 161 (9th Cir.1972) (emphasis added).

Although harder to locate and requiring close examination of the facts, the "old" Fifth Circuit recognized the *Redisco* position that title is irrelevant under Article 9. Just under thirty (30) years ago, a judge of the Eleventh Circuit—while as a judge of the Fifth Circuit before the severance of the Eleventh from the Fifth Circuit—authored the opinion in *Mills Morris Co. of Miss., Inc. v. Scanlon (In re King–Porter Co.),* 446 F.2d 722 (5th Cir.1971). In the *King–Porter* matter, Judge Dyer addressed whether a creditor had a perfected security interest under Mississippi's Uniform Commercial Code, Miss.Code Ann. §§ 41A: 9–101 *et seq.* (Spec.U.C.C.Supp.1967). In *King–Porter,* the creditor had obtained a security agreement from the debtor/buyer/bankrupt and had timely and properly filed financing statements. *King–Porter,* 446 F.2d at 725. In the court's discussion during which it finds that the creditor had a perfected security interest under the Uniform Commercial Code, the *King–Porter* panel evidences that it knew that the creditor also had trust receipts for each good sold by the creditor to the debtor/buyer/bankrupt. *King–Porter,* 446 F.2d at 725. Despite its knowledge of the existence of these trust receipts which under pre-Uniform Commercial Code law put legal title to the goods in the selling creditor, the Fifth Circuit gave no weight to this factor and

decided the perfected security interest issue under Article 9 by following § 9–202's dictate that title is immaterial. The opinion also demonstrates that the Fifth Circuit viewed the treatment of trust receipts as the Third Circuit had in *Redisco:*

> A trust receipt, of course, is also a 'security agreement'. *See Redisco, Inc. v. United Thrift Stores, Inc.,* 3 Cir.1966, 363 F.2d 11, 14. It is not clear whether to secure its interests in the property, claimant believed that these trust receipts were necessary in addition to the security agreement of February 14 or whether they were executed to enable claimant, should he desire, to conveniently assign chattel paper covering individual shipments to financing institutions.

*King–Porter,* 446 F.2d at 725 n. 2.

For purposes of this Court's ruling and for how what is now the Eleventh Circuit has, while forming a part of the Fifth Circuit, treated title and contracts involving title to goods being retained by a seller or held by a creditor, *King–Porter* must be recognized as the seminal case of this Circuit on the Court of Appeals level where the location of title to goods and the form of contract placing title in the secured party were disregarded as irrelevant and immaterial to resolution of a secured party's and a debtor's interests and rights under the Uniform Commercial Code. *Cf. Cohen v. Office Depot, Inc.,* 204 F.3d 1069, 1072–1076 (11th Cir.2000).[3] Just over a quarter of century ago, the Eleventh Circuit's predecessor knew and followed what the Uniform Commercial Code specifies should be the analysis and outcome.

Furthermore, the fact that *King–Porter* was decided under Mississippi's Uniform Commercial Code is of no moment. Its Uniform Commercial Code as it existed then is in all relevant and material aspects identical to Alabama's. *Compare* Miss. Code Ann. §§ 41A:1–201, 41A:2–401, 41A:9–102–105, 41A:9–109, 41A:9–202,

41A:9–503–507 (Spec.U.C.C.Supp.1967) *with* Ala.Code §§ 7–1–201, 7–2–401, 7–9–102–105, 7–9–109, 7–9–202, 7–9–503–507 (1997). The inescapable impact of this is that the *Hall Motors* court's reading of non-uniform, pre-code law into Alabama's Uniform Commercial Code is in direct conflict with the *King–Porter* court's correct handling of such concepts under the same uniform law.

More importantly, the *Yale Express, Redisco, Spanish Language Television,* and *King–Porter* courts recognized that interests and rights are established by Article 9. They also understood that to look elsewhere would destroy the guiding concept of uniformity among and between jurisdictions which was the predicated premise for adoption of this uniform law.

### (c) *The Dispatchers—The Application and Definition*

Although there are other arguments and reasons evident from the language of Article 9 of the Uniform Commercial Code which this Court will not belabor, the best dispatchers of any vestigial contention that this is not the law of Alabama or any other jurisdiction having adopted and retained the relevant provisions of Article 9 in substantially the form this uniform law was drafted are Ala.Code § 7–9–102(2) (1997) conjoined with Ala.Code § 7–1–201(37)a (1997). Section 7–9–102(2) contains this wording:

> This article applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security.

Ala.Code § 7–9–102(2) (1997). The meaning of this section is made unmistakable by the Official Comment following section 7–9–102:

---

**3.** For a discussion of why under the Eleventh Circuit's *stare decisis* rule *King–Porter* may be

the binding precedent on this Court, not *Hall Motors,* see footnote 11 *infra.*

The main purpose of this section is to bring all consensual security interests in personal property and fixtures under this article, except for certain types of transactions excluded by Section 7–9–104. In addition certain sales of accounts and chattel paper are brought within this article to avoid difficult problems of distinguishing between transactions intended for security and those not so intended. As to security interests in fixtures created under the law applicable to real estate, see Section 7–9–313(1).

1. Except for sales of accounts and chattel paper, the principal test whether a transaction comes under this article is: Is the transaction intended to have effect as security? ... *When it is found that a security interest as defined in Section 7–1–201(37) was intended, this article applies regardless of the form of the transaction or the name by which the parties may have christened it. The list of traditional security devices in subsection (2) is illustrative only; other old devices as well as any new ones which the ingenuity of lawyers may invent, are included, so long as the requisite intent is found. The controlling definition is that contained in subsection (1).*

*The article does not in terms abolish existing security devices. The conditional sale or bailment-lease, for example, is not prohibited; but even though it is used, the rules of this article govern.*

Ala.Code § 7–9–102 official comment (1997) (emphasis added).

Section 7–1–201(37)a defines "security interest" in Article 1:

'Security interest' means an interest in personal property or fixtures which secures payment or performance of an obligation. *The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 7–2–401) is limited in effect to a reservation of a 'security interest.'*

Ala.Code § 7–1–201(37)a (1997) (emphasis added). The meaning of these sections could not be plainer.

As should be apparent, reference to the wording of the statute answers what interests a debtor and a secured party have in collateral. It is these words without reference to Alabama case law which disclose that in Alabama a debtor like Mr. Greene retains until sale or other disposition of the Mustang, as allowed under Ala.Code §§ 7–9–504, 505 (1997), a property interest in the Mustang and that The Associates holds merely a security interest. Then, under federal law, 11 U.S.C. § 541(a)'s expansive scope makes "all legal or equitable interests of the debtor in property as of the commencement of the case"—which included the Mustang—property of Mr. Greene's bankruptcy estate. For this reason, The Associates argument that Mr. Greene's bankruptcy estate had no interest in the Mustang once he defaulted under the Contract and before a proper disposition under the Alabama's Uniform Commercial Code is untenable.

This is so because the body of the Uniform Commercial Code given support by the skeleton of its articles, made operational by the organs and systems of its sections, held together by the connective tissue of its subsections along with the interstitial matter formed by its official comments would, over time, as courts resort to pre-Uniform Commercial Code, nonuniform laws to interpret it, become disfigured to the extent that no consistency of outcome between and among the adopting jurisdictions occurs or may be anticipated. This would effectively undo that which has been achieved. To now retrograde to the long discarded *Hall Motors* approach is in derogation of Alabama's statutes, the uniform law, and the contrary authority displayed by the language and official comments of both.

These are not the only reasons why The Associates' legal arguments are incorrect and why the *Hall Motors* ruling is unsup-

portable under Alabama law. One need only turn to Alabama's courts to find more.

### B. *Alabama Courts—The Concordance*

Although this Court will not present every Alabama authority which demonstrates that Alabama recognizes the corollary that a secured party's interest in collateral post default and predisposition is no more than a security interest, it would be remiss if it failed to set forth unequivocal, Alabama case law establishing that following default a debtor retains an interest in the collateral securing repayment of a debt. All of the cases to be discussed were decided under Alabama's Uniform Commercial Code.

In what is the progenitor of reported, appellate decisions in Alabama regarding the sufficiency of notice of sale of a repossessed automobile, *Wells v. Cent. Bank of Ala.*, 347 So.2d 114 (Ala.Civ.App.1977), the Court of Civil Appeals considered whether the repossessing creditor/secured party had converted Mr. Wells' property, a 1972 Plymouth station wagon. In doing so, this Court (a) repudiated one of its prior precedents which is one of the underlying Alabama cases on which the *Hall Motors* holding is founded, and (b) clearly considered and rejected the argument that under Alabama's Uniform Commercial Code a debtor is totally divested, on default, of all interest in a motor vehicle constituting collateral of a secured party. The *Wells'* court's language is:

> The sale of the auto here is proof of conversion. *Kyle v. Gray*, 11 Ala. 233 (1847); *Richard Kelley Chevrolet, Inc. v. Williams*, 343 So.2d 776 (Ala.Civ.App. 1977). *Some cases have indicated that where the creditor has a right to repossess because of the debtor's default, the debtor cannot maintain a claim for conversion because he has no legal right to possession. Automotive Acceptance Corp. v. Powell*, 45 Ala.App. 596, 234 So.2d 593 (1970); *William Iselin & Co. v. Burgess & Leigh, Ltd.*, 52 Misc.2d 821, 276 N.Y.S.2d 659, 3 UCC Rep.Serv. 1168 (1967). *But the debtor is not completely divested of all right and interest in the auto by default, neither is the creditor vested with full power to do with the auto as wished. State v. Weber*, 76 N.M. 636, 417 P.2d 444, 3 UCC Rep.Serv. 907 (1966); *In re Trans National Communications, Inc.*, 11 UCC Rep.Serv. 238, Bankruptcy No. 71–B–313 (S.D.N.Y.1972); Anderson, s 9–501:7. Here the debtor still had a right to redeem under s 9–506. In fact a tender under the circumstances was a vain and useless thing. *Owens v. Automobile Recovery Bureau, Inc.*, 544 S.W.2d 26, 20 UCC Rep.Serv. 820 (Mo. App.1977).

> Defendants were not entitled to dispose of the car without proper notice. *The purpose of the notice is to enable the debtor to protect his interest in the property* by paying the debt, finding a buyer, being present at the sale to bid on the property or have others do so, in order to keep from sacrificing the collateral at a secret sale at less than its true value.

*Wells,* 347 So.2d at 120 (citation underscoring intentionally deleted and emphasis added).

It is essential to note that the *Wells* opinion cites *Automotive Acceptance Corp. v. Powell,* 45 Ala.App. 596, 234 So.2d 593 (Ala.Civ.App.1970). *Automotive Acceptance* is one of the few Alabama decisions which the Alabama authority cited in *Hall Motors* relied on for the point that on default by a debtor all property interests in collateral vest absolutely in the secured party. In *Wells* in 1977, this *Automotive Acceptance* determination was rejected when the Court of Civil Appeals considered and held that under the Uniform Commercial Code a defaulting debtor retains an interest in property acting as collateral for a secured party. At least, that is, until the point of its sale.

This *Wells* holding has been repeated in subsequent opinions of Alabama's courts. The Court of Civil Appeals reiterates its *Wells'* determination that the purpose of

notice of disposition of collateral under the Uniform Commercial Code is to permit a debtor to protect his interest in the property being disposed of in *Daniel v. Ford Motor Credit Co.*, 612 So.2d 483, 484–85 (Ala.Civ.App.1992) (Quoting *Lavender v. AmSouth Bank, N.A.*, 539 So.2d 193, 195 (Ala.1988), which based its ruling on *Wells*.); *Underwood v. First Ala. Bank of Huntsville*, 453 So.2d 742, 746 (Ala.Civ. App.1983) (Restating this conclusion from *Simmons Machinery Co. v. M & M Brokerage, Inc.*, 409 So.2d 743 (Ala.1981), which cited *Wells* for the same proposition.).

Not long after the Court of Civil Appeals of Alabama, the Supreme Court of Alabama reached the identical resolution in multiple cases involving claims of conversion and sale of collateral in a commercially unreasonable manner. Each of these opinions involves Alabama's highest court's discussion of the fact that as a matter of Uniform Commercial Code law, a debtor retains an interest in collateral securing his/her/its performance until its sale or other disposition.

In *Simmons Machinery Co. v. M & M Brokerage, Inc.*, 409 So.2d 743 (Ala.1981), a conditional sales contract was the method by which the secured party financed the buyer's purchase of a drill. Under a conditional sales contract, title to the item is traditionally held by the seller or secured party until the final payment is made by the purchaser. One of the claims asserted against the secured party was conversion. In analyzing the interests of the buyer/debtor under the Uniform Commercial Code, the Supreme Court of Alabama never mentions "the title and right to possession on default vesting in the secured party" *Hall Motors* analysis of how to decide if a defaulting debtor has an interest in the collateral. Instead its opinion contains this:

> We are mindful that a *default debtor's right to notice of the intended disposition of the secured collateral is one of the most important rights affording a*

> *debtor protection of his interest in the secured collateral under the U.C.C.*

*Simmons*, 409 So.2d at 748 (emphasis added). Then the *Simmons* court quotes the *Wells'* language setting forth the same statement of law. *Simmons*, 409 So.2d at 749. Next, it discusses a case cited to it as authority for Simmons Machinery's argument regarding the sufficiency of notice of a private sale under the Uniform Commercial Code, *Rainey v. Ford Motor Credit Co.*, 294 Ala. 139, 313 So.2d 179 (1975). Its response to Simmons Machinery's *Rainey* predicated argument on whether Simmons Machinery had given sufficient notice of sale under the Uniform Commercial Code is attestation to the misapplication of *Rainey* and any case premised on *Rainey* as being decided under the Uniform Commercial Code. The *Simmons* opinion contains this:

> Simmons argues, therefore, that because the notice in *Rainey* was sufficient to comply with the notice requirements for a private sale under § 7–9–504(3), so is Alabanc's letter November 16, 1976, sufficient notice for a private sale. *The fallacy with Simmons's argument is that this court never decided the sufficiency of the notice involved in Rainey.* The notice involved in *Rainey* is mentioned by this court only as factual background. That case was decided on other grounds not involving the sufficiency of the notice received by *Rainey. We are, therefore, unable to attach to Rainey the precedential value Simmons urges we ascribe to it.*

> *Simmons's sale of the collateral without satisfying the notice requirements of Code 1975, § 7–9–504(3), constituted a conversion. Wells v. Central Bank of Alabama, N.A.*, 347 So.2d 114 (Ala.Civ. App.1977).

*Simmons*, 409 So.2d at 750–751.

*Rainey* is also one of the other cases forming the foundation of the conversion law discussions in the Alabama cases cited in *Hall Motors*. Despite *Simmons* involving a conversion claim, *Simmons* being

decided by the Supreme Court of Alabama under the Uniform Commercial Code, and *Rainey* involving a conversion claim for a motor vehicle, the *Simmons* court did not even allude to the interpretation of *Rainey* utilized by the cases relied on in *Hall Motors, Am. Nat'l. Bank & Trust Co. of Mobile v. Robertson*, 384 So.2d 1122 (Ala. Civ.App.1980); *Pierce v. Ford Motor Credit Co.*, 373 So.2d 1113 (Ala.Civ.App.), *writ denied sub nom., Ex parte Pierce*, 373 So.2d 1115 (Ala.1979); *Thompson v. Ford Motor Credit Co.*, 550 F.2d 256 (5th Cir. 1977), for the foisted proposition that *Rainey's* conversion law analysis under the Uniform Commercial Code is "legal title and possession of the collateral is in a secured party on a debtor's default." Instead and inimical to the *American National Bank, Pierce, Thompson* representation of what *Rainey* held and its usage by these cases as adopted by the *Hall Motors* panel, the Alabama Supreme Court followed what the Uniform Commercial Code specifies and the *Wells* court concluded: a debtor retains a property interest in the collateral after default and before its disposition. The implication of *Simmons* may not be overlooked. It overruled *Rainey* to the extent it was ever Alabama's law—which it was not—determining a debtor's interest in collateral post default, pre-disposition under the Uniform Commercial Code. This further undercuts the foundation of the Alabama authority relied on by the *Hall Motors* court.

Another difficulty is that the *Rainey* court recognized what the *Pierce, American National Bank,* and *Thompson* courts did not: the rule of legal title and possession of collateral in a secured party on a debtor's default was the rule before adoption of the Uniform Commercial Code. The complete, relevant portion of the quote from *Rainey* is "[i]n *Rhodes–Carroll Furniture Co. v. Webb*, 230 Ala. 251, 160 So. 247 (*pre-UCC*), this court said as to some counts in trover: 'But as defendant had the legal title and the lawful right to possession, manifestly there could be no recovery for a conversion \*\*\*.' " *Rainey*,

313 So.2d at 183 (emphasis added). It is evident that *Rainey* was miscited in *American National Bank, Pierce,* and *Thompson*. In turn, this incorrect usage of *Rainey* by those courts leaves, on a superficial examination, apparent case law authority for that which *Hall Motors* relied on *American National Bank, Pierce,* and *Thompson*. Unfortunately, this apparent authority is not authentic and is invalid.

This is not the end of it. Three later opinions of the Supreme Court of Alabama which were decided under Alabama's Uniform Commercial Code followed *Simmons* and *Wells* on this point. *Lavender v. AmSouth Bank, N.A.*, 539 So.2d 193 (Ala. 1988) involved a debtor's claims of conversion of motor vehicles by a secured party. Here too, the Supreme Court quoted the *Wells* notice to a defaulting debtor to enable the debtor to protect his interest in the property language. *Lavender*, 539 So.2d at 195. Likewise, no utterance was made of the title coupled with possession on default vesting in the secured party purported *Rainey–Automotive Acceptance* reasoning. So also for *First Nat'l. Bank of Dothan v. Rikki Tikki Tavi, Inc.*, 445 So.2d 889 (Ala.1984) (*Wells* cited in case involving alleged commercial unreasonableness of sale under Ala.Code of 1975, § 7–9–504).

Once more in yet another conversion case involving an automobile and its alleged wrongful sale under Ala.Code of 1975, § 7–9–503, *Rhodes v. Gen. Motors Corp.*, 621 So.2d 945 (Ala.1993), the Supreme Court of Alabama quotes the *Wells* defaulting debtor's retaining an interest in property constituting the collateral until disposition language and approvingly cites to its earlier *Lavender* and *Simmons* opinions. This aspect of the *Rhodes* decision was articulated by the Alabama court within the confines of the Uniform Commercial Code. To ascertain what property interest a defaulting debtor has in collateral under the Uniform Commercial Code, there is a demonstrated consistency of legal analysis

by the Supreme Court of Alabama. There is no reference in *Rhodes* to the conversion law principles relied on in *Hall Motors* or to Alabama's pre-Uniform Commercial Code law which had used the concept of title coupled with possession vesting in a secured party on a debtor's default. *Rhodes*, 621 So.2d at 950.

Although not as quickly discernible, nor as easily located, as the statutory language and its official commentary, this much is evident from Alabama's case law on a defaulting debtor's interest in collateral under the Uniform Commercial Code: it is that a debtor possesses a property interest in collateral until its sale or other disposition. This is what has been continuously and luculently communicated by Alabama's appellate courts.

### C. Article 10—Repeal, Resurrection and The Implications

#### (1) Article 10—Repeal

Something of importance is discernable from the sections on repeal set forth in Article 10 of Alabama's Uniform Commercial Code. On its adoption, certain statutes which had controlled facets of title retention and/or title transfer as a method of securing debt repayment and of liens were expressly repealed and others were repealed by a general provision that "all acts and parts of acts inconsistent with this title are hereby repealed." Ala.Code §§ 7–10–102 & 103(1997).[4] What is evident is that the adoption of the Uniform Commercial Code by Alabama was done concomitantly with the wholesale repeal of then extant Alabama statutes requiring recording of liens, mortgages, encumbrances, security interests, trust receipts and similar debt securing devices, delineating the effect of recording and not recording, and

specifying the how, when, and where to perfect a secured party's interest, including title, in personal property securing payment of a debt. Ala.Code § 7–10–102(1) (1997).

Once repealed, it became, and still is, no longer possible to create and perfect a lien, mortgage, trust receipt or other debt securing device under these former statutory provisions. The statutory method for covered personalty was to be and remains that provided by the Uniform Commercial Code. *See generally* Ala.Code §§ 7–9–101 *et seq.* (1997). The effect of the repeal of these laws has been that case law decided by reliance on any of them is abrogated for transactions entered into after the effective date of Alabama's Uniform Commercial Code: midnight on December 31, 1966. Ala.Code § 7–10–101 (1997).

Added thought on the outcome of the repeal of these statutory provisions reveals another defect in *Hall Motors*. The only ways in Alabama to perfect an interest in collateral vis-a-vis persons and entities not parties to a security creating transaction which is governed by the Uniform Commercial Code are by compliance with its mandates. All that is allowed is perfection of a security interest—not title. Ala.Code § 7–1–201(37)a (1997); Ala.Code §§ 7–9–102(2), 202, 507 (1997).

Admittedly, one may argue that legal title is not prevented from being held in the name of the secured party for purposes outside the scope of application of the Uniform Commercial Code. Even this Court's citations of certain of this uniform code's sections and quotes from portions of the official comments reveal this truism. Ala.Code § 7–9–203 official comment

---

**4.** A few of these expressly repealed by Acts of Alabama No. 549, p. 811 (1965) include portions of Title 47, Chapter 3 of the 1940 Code of Alabama, as amended, encompassing perfection of title and liens against third parties under mortgages of personal property, the effect of requiring recordation of mortgages and judgments as to subsequent purchasers and lien claimants, the stipulation that defea-

sance of absolute conveyances of personalty are to be recorded, the making of unrecorded defeasances void as to creditors and purchasers from a grantee without notice, and application of these same rules to other collateralization devices such as conditional sales and trust receipts. Ala.Code § 7–10–102 (1997); 1940 Ala.Code Tit. 47 §§ 110, 111, 123, 124 (1941), & 131 (Supp.1955).

(1997). This does not make the inability to perfect title under Alabama's laws of no consequence.

Though one may have title to collateral held by a secured party and perfect what a secured party may only perfect, a security interest, under Article 9 or as otherwise recognized by Article 9, this does not end in title held by a secured party being unassailable. The repealed, pre-Uniform Commercial Code, Alabama statutes regulating perfection of interests in personal property had as one purpose the protection of claimants to interests in or against, including absolute ownership of, the same personal property. This included the bona fide purchaser without knowledge or notice of others' claims in or to the personalty. Likewise, other secured parties were enveloped within this purpose. The same is done by Article 9. As did the repealed laws it supplanted, Article 9 specifies the method or methods by which a secured party may protect his/her/its interest and priority with respect to collateral against claims of others. But there is a critical difference.

Before the Uniform Commercial Code, there was disharmony in the law of secured transactions among and between states. In part, it arose from some states treating all security creating devices as only creating liens in the collateral while others did more. This other group, which included Alabama, used title theories and gave creditors with collateral a greater interest in the collateral than the lien theory jurisdictions. *See Harmon v. Dothan Nat'l Bank*, 186 Ala. 360, 64 So. 621, 623 (1914); *Jackson, Morris & Co. v. Rutherford*, 73 Ala. 155 (1882). The Uniform Commercial Code dissimilarity is it eliminated the lien versus title differentiation for transactions within Article 9's purview. Ala.Code § 7–9–202 (1997).

Once these Alabama, pre-Uniform Commercial Code, laws were repealed, resort to perfection of a creditor's interest in collateral could only be had to either (a) the common law rule which had no perfec-

tion mechanism and placed one such as a bona fide purchaser without knowledge into the precarious position held before enactment of recording statutes, i.e., at risk of purchasing goods subject to a prior, undisclosed interest, *see, e.g., Fairbanks, Morse & Co. v. The Eureka Co.*, 67 Ala. 109 (1880), or (b) the superceding Uniform Commercial Code which carries forward and makes consistent in application and outcome the purposes for which such recording statutes were enacted by its Article 9 security interest, attachment, perfection scheme. Common sense, the dictates of commerce, and the evolution of the jurisprudence of commercial transactions have long since taken secured transactions past the point of return to the common law and pre-Uniform Commercial Code statutory rules. One need not cite to authority to comprehend that any return to the before recording statute period as the result of a court determination should not occur when clear, contrary, statutory law exists. The best authority that one is to look to and prospectively decide security interest issues under Article 9 is this statute. Ala. Code § 7–9–102 (1997). The impact of this wholesale repeal means perfection is to occur as specified under the Uniform Commercial Code which is limited to security interests, nothing more.

*(2) The Resurrection—First Implication*

Yet this is precisely what *Hall Motors* does not recognize. Because of this lack of recognition two implications occur which are contrary to the purposes of two statutes of national scope. One is obviously the Uniform Commercial Code. The other is not so obvious.

Since for covered transactions, Alabama's Uniform Commercial Code is the law determining the interests in collateral, the rights, and the remedies of a debtor, a secured party, and third persons, and *Hall Motors* involved a debtor-secured party agreement within the Uniform Commercial Code, it takes the Alabama adjudication of these matters between the debtor and secured party out of the Uniform Commer-

cial Code's design by incorporating into it the concept of title that was used by the repealed Alabama laws. This is done by use of the common law mortgage rule of the absolute vesting of legal title and possession in the secured party on a debtor's default as the rule for what happens under the Uniform Commercial Code. *See Hall Motors,* 137 F.3d at 1283–1284.

A more direct conflict with the explicit provisions of Ala.Code §§ 7–9–501–507 (1997) could not exist. Seeing this inconsistency may be made difficult by the cloud of facts and legal principles, but once discerned it is shockingly obvious what *Hall Motors* has wrought. What is far more obscure to the viewer is what impact the transplantation of title to redefine the law which replaced it has on the rights, remedies, and interests inter se a secured party and third parties to a transaction who/which claim an interest in the same personal property. For purposes of this case, one need only know that other problems to the sought and achieved uniformity created by Article 9 have been born by the *Hall Motors* ruling. This is but one indication of what is at risk and is but one of the far reaching consequences of *Hall Motors* remaining as a legal precedent.[5]

(3) *Resurrection—Second Implication*

Another is that the same has happened to the other uniform law at issue in this Greene–The Associates case, the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq. Hall Motors* has done the same to the Bankruptcy Code that it has done to Alabama's Uniform Commercial Code. It has returned it to how its predecessor statute, the Bankruptcy Act of 1898, used the title concept to determine what property was within its scope.

Once one uses title coupled with the right to possession as the definition of all interests in the property making up what is the collateral and joins it with the *Hall Motors* court's other legal conclusion that "[w]e are not convinced, however, that the mere existence of the estate's ability to redeem the automobile renders the automobile itself 'property of the estate,'" title becomes the determinative factor of whether a debtor in default has any interest in the collateral for "property of the estate" purposes under § 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a). Under this *Hall Motors* analysis, the court looked to state law to see if a debtor holds title on default. If not, under Alabama law he/she/it does not have a property interest in the collateral, a motor vehicle. *Hall Motors,* 137 F.3d at 1284–1285. The Eleventh Circuit panel then concluded the automobile is not property of the estate under 11 U.S.C. § 541(a)(1). *Hall Motors,* 137 F.3d at 1284.

This is identical to the analytical method employed under the Bankruptcy Act of 1898. Under § 70a of the Bankruptcy Act of 1898, 30 Stat. 544 (1898), through its revised forms including the Chandler Act, 52 Stat. 840 (1938) & 53 Stat. 1134 (1939), property of one adjudicated a bankrupt which was subject to the provisions of the bankruptcy laws was usually property in which a debtor/bankrupt held title.

▪ Contrary to this use of title, § 541 of the Bankruptcy Code, 11 U.S.C. § 541, did away with the old title approach and does not use title as the controlling factor of what is "property of the estate."[6] Now the *Hall Motors* ruling reincarnates title to make it the decisional factor of what property is or is not "property of the estate." Akin to the first implication is the second. Its retention as legal authority makes Alabama debtors in a bankruptcy

---

**5.** The esoterics of this phenomenon need not be discussed for a decision in this case. It is sufficient to say that finding all the results of what this causes requires use of multi variate analysis more commonly employed in disciplines using higher mathematics. To date, there has been little—more likely no—significant development of what may be called legalmetrics.

**6.** There is one caveat to the elimination of the legal title determinative rule not relevant to this case. It is set forth in 11 U.S.C. § 541(d).

case subject to a version of the Bankruptcy Code different from that in other federal jurisdictions. This, too, defeats the uniformity achieved by the federal law of bankruptcy.

### D. Uniform Commercial Code Outcome

■ Given the standard of Article 9 as adopted by Alabama that what a secured party obtains is only a security interest in the collateral, the fact that the same is true under Alabama's uniform statute regulating perfection of liens against motor vehicles, the unchanging interpretation of Alabama's courts that a debtor under Article 9 of the Uniform Commercial Code retains an interest in the personal property used as security for performance of an obligation until its disposition, the Yale Express, Redisco, Spanish Language Television, King–Porter holdings to the same effect, and the adverse consequences to two statutes fabricated to have uniform, nationwide application from any contrary conclusions, there is overwhelming authority that Alabama's Uniform Commercial Code arrives at the identical resolution of what property interest a debtor has in personalty on his/her/its default and that a secured party for Article 9 usage has only a security interest. This leads to the unavoidable fact parallelism and legal resemblance of this Greene Chapter 13 adjustment of debts case to the Chapter 11 reorganization in United States v. Whiting Pools, Inc., 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). At the time of filing of Mr. Greene's petition, there was no meaningful difference between the Internal Revenue Service's lien in Whiting Pools for purposes of its Chapter 11 reorganization and the security interest held by The Associates in Mr. Greene's adjustment of debt Chapter 13 case. See Whiting Pools, 462 U.S. at 210–211, 103 S.Ct. 2309. The outcome is that the Mustang was, on filing of Mr. Greene's case, part of the property of his bankruptcy estate under § 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a).

### V. Stare Decisis and The Dead Pledge a/k/a Mort Gage—Law, Facts, Both, One, or None

#### A. Facts Make A Difference

Despite (i) how Alabama's Uniform Commercial Code details the scope of a debtor's interest in collateral following default and before disposition and (ii) Alabama's courts' consistent interpretations of what is provided in Alabama's Uniform Commercial Code which is at divergence with Hall Motors, the United States Court of Appeals for the Eleventh Circuit's adherence to stare decisis, see, e.g., Cohen v. Office Depot, Inc., 204 F.3d 1069 (11th Cir.2000); Bonner v. City of Prichard, Ala., 661 F.2d 1206 (11th Cir.1981), commands that even if Hall Motors is wrongly decided it is to be followed if its law applies to the facts of this case. To make this judgment, this Court has had to assess the factual similarities of Hall Motors and address whether Hall Motors is the applicable law. Since facts often regulate the outcome of a legal dispute, knowing the Hall Motors factual context assists in understanding one part of the inequality between Hall Motors and the issues before this Court in the Greene Adversary Proceeding.

#### (1) Hall Motors Facts

In August, 1992, Elgin Lewis purchased a used automobile from Hall Motors. The payments due under the contract were to be made weekly and Mr. Lewis granted "to Hall Motors, as collateral, a security interest in the automobile." Hall Motors, 137 F.3d at 1281. In October, 1992, Mr. Lewis breached his contract with Hall Motors by not making all of the required weekly payments. Shortly after this default in 1992, Mr. Lewis and his wife filed a joint petition seeking relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. §§ 1301 et seq. Their 1992 bankruptcy case was dismissed on March 28, 1993. On June 2, 1993, Hall Motors repossessed the automobile. On June 4, 1993, the Lewises filed another case under Chapter 13 of the

Bankruptcy Code, again scheduled the automobile, and proposed as part of their Chapter 13 plan that they pay to "Hall Motors sixty-two cents on the dollar for the automobile's outstanding secured balance." *Hall Motors,* 137 F.3d at 1281–1282. After they had filed their 1993 Chapter 13 case, Hall Motors refused a request made on behalf of the Lewises for the return of the automobile. As a consequence of the refusal, an adversary proceeding was filed by the Lewises seeking as one form of relief the turnover of the vehicle under 11 U.S.C. § 542(a). *Hall Motors,* 137 F.3d at 1282.

Certain of the *Hall Motors* facts are a mirror image of those involving Mr. Greene and The Associates. Both bought an automobile on credit. In each transaction, the automobile was used as collateral to secure the contractual performance of the purchaser. Although not disclosed in *Hall Motors,* the form of security instrument utilized must have been properly perfected or, at least, this issue was not in dispute and assumed to be the state of affairs. Here, The Associates properly perfected its security interest in the Mustang. In *Hall Motors* and this case, a default by the purchaser under the terms of the respective contracts occurred and each automobile was repossessed before the filing of a bankruptcy petition. Both Elgin Lewis and Mr. Greene filed bankruptcy petitions under Chapter 13 of the Bankruptcy Code before either's vehicle could be sold by the secured party. Beyond these, the facts of this case diverge from those in *Hall Motors.*

Some facts not in the *Hall Motors* opinion which would help in fixing the scope of application of the Eleventh Circuit's ruling to this Greene–The Associates matter are those which would reveal more fully what type of contract was involved in *Hall Motors.* Just why this is important is divulged by a review of the law forming the *ratio decidendi* of *Hall Motors* that "[u]pon a debtor's default, title and right of possession pass to the creditor." *Hall*

*Motors,* 137 F.3d at 1283. To learn the origin of this statement of law and to what transactions it applies necessitates an historical overview of Alabama's law of mortgages.

#### (2) *The Dead Pledge, Mort Gage, Mortgage Law—Origins, Development, Application, and More*

##### (a) *Origins*

In its original composition in England which dates from about the twelfth century, a mortgage was used in real property transactions and transferred on execution absolute ownership of property of a debtor/mortgagor to the creditor/mortgagee. There was no provision in the mortgage to transfer the property constituting the collateral back to the debtor/mortgagor on satisfaction of the debt. H. Cohen, *Alabama Mortgage Law,* 1–2 (1989). In legal terminology, there was no defeasance provision in the mortgage. Also at its inception and during the early years of its use, a mortgage transferred to the mortgagee on execution the immediate right of possession of the mortgaged property.

The way mortgages operated at this time was that the mortgagor had to pay what was owed by the law day—the due date of the obligation—or the property was lost. Once this occurred, all the rights of the mortgagor were considered dead. This was effectively a forfeiture. To regain the property, the mortgagor had to pay the debt secured by the law day and have the mortgagee either reconvey the property to the mortgagor or to release the mortgage. At the time of their earliest use, this is how mortgages were utilized and viewed by courts sitting as courts of law. H. Cohen, *Alabama Mortgage Law,* 1–2, 7–8, 13–14 (1989).

##### (b) *Developments*

In the mid part of the seventeenth century to ameliorate the forfeiture nature of mortgages on default, the courts of equity granted mortgagors the right to redeem the mortgaged real property. This right is now called the equity of redemption or

equitable right to redeem. At first, there was no time constraint on when this right of redemption could be exercised. This caused obvious title and marketability problems for real estate. Later in the seventeenth century, the mortgagee was given the ability to request a court of equity terminate the equity of redemption. It was initially done by a court decree that a sum of money be paid by a fixed date, and, if not, the mortgagor was foreclosed of all the equity of redemption. This was done without a judicial or other sale and became known in this country as strict foreclosure. H. Cohen, *Alabama Mortgage Law*, 3–4 (1989); G. Glenn, 1 *Mortgages* 3–18, 358–362, 395–406 (1943); G. Osborne, *Mortgages* 4–5, 7–10, 15–16, 144 (2d ed.1970); *see also BFP v. Resolution Trust Corporation*, 511 U.S. 531, 541–542, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

Some of what else happened over time were the addition of defeasance clauses in mortgages, and statutes were enacted in many jurisdictions mandating foreclosure sales, abolishing strict foreclosure, and re-vesting legal title in the mortgagor on full payment of the obligation. *See, e.g., Askew v. Sanders*, 84 Ala. 356, 4 So. 167, 168 (1888). Provisions were added to mortgages allowing the mortgagor to remain in possession of the collateral. Still, legal title was transferred to the creditor/mortgagee on execution of the mortgage. In spite of various modifications by court decision, contract, and statute, what this still meant was that under mortgage law legal title to the collateral was held by the creditor/mortgagee once the mortgage was signed and delivered. This was the rule in courts of law, but it did not remain the only one courts utilized. Some jurisdictions, not Alabama, eventually dealt with all mortgages as simply creating a lien against the mortgaged property, not as conveying legal title. *See Harmon*, 64 So. at 623. Others joined the ranks of states which looked upon mortgages as creating only a lien against property on the merger of their courts of law and equity. *See Harmon*, 64 So. at 623. This merger of

courts is of significance to why *Hall Motors* is incorrect on its view of the Alabama law at issue in this Greene Adversary Proceeding.

### (c) *Pre–Merger—Law vs. Equity*

The reader needs to appreciate that the merger of courts of law and courts of equity is a relatively recent phenomenon. This is true for Alabama which did not authorize the merger of the law and equity sides of its courts until September 17, 1971, Act No. 1311, Acts of Alabama 1971. This merger was not effective until July 3, 1973, by order of the Supreme Court of Alabama of January 3, 1973, adopting the Alabama Rules of Civil Procedures.

### (i) *Law*

Prior to this 1973 date, Alabama—as did many jurisdictions—treated mortgages and the interests, rights, and remedies of the mortgagor and mortgagee in a court of law differently than courts of equity. In its courts of law, Alabama followed the long standing principles that (i) a mortgage creates a direct, immediate estate in fee simple unless otherwise expressly limited, subject to a condition that is defeated on payment in full, (ii) on execution the mortgagee is entitled to possession and the mortgagor is merely a tenant at will unless the mortgage provides otherwise, and (iii) after the law day—the original date the debt is fully due and payable—and on default by the mortgagor in performance, the estate is absolutely vested in the mortgagee. *Welsh v. Phillips*, 54 Ala. 309 (1875); *Bank of Florala v. Smith*, 11 Ala.App. 358, 66 So. 832 (1914).

After the promissory note due date and on default by the mortgagor, the law of mortgages left nothing in the mortgagor. *See Welsh*, 54 Ala. at 315; *Florala*, 66 So. at 833. Again recall that this resulted from the absolute vesting of legal title and the right of possession in the mortgagee and was viewed as a forfeiture which was modified by courts of equity. In this respect, Alabama's courts were no different and incorporated the equity of redemption

right into its mortgage principles. What was allowed was a mortgagor had the right to redeem his property up to a fixed point in time. *Welsh,* 54 Ala. at 315; *Bank of Florala,* 66 So. at 833; *see also Federal Deposit Ins. Corp. v. Morrison,* 747 F.2d 610 (11th Cir.1984). Unfortunately in Alabama before the merger of its courts of law and equity, the equity of redemption right was not recognized or enforceable in courts of law. *See Farris & McCurdy v. Houston,* 74 Ala. 162 (1883); *Toomer, Sykes & Billups v. Randolph,* 60 Ala. 356 (1877); *Welsh,* 54 Ala. at 315.

Another development mitigating the loss by a debtor in default of the mortgaged property was statutory. Alabama has had multiple statutes which have granted a mortgagor the right to redeem property sold at foreclosure for a period following the completion of the foreclosure sale. Ala.Code § 6–5–248 (1993); Ala.Code § 6–5–230 (1977); 1940 Ala.Code Tit. 7, § 727 (1941); 1923 Ala.Code § 10140 (1923); 1907 Ala.Code § 5746 (1907); 1897 Ala. Code § 3505 (1897); 1886 Ala.Code § 1879 (1887); 1876 Ala.Code § 2877 (1877); 1867 Ala.Code § 2509 (1867); 1852 Ala.Code § 2116 (1852). The right of redemption under these statutes has been sometimes denominated statutory redemption.

#### (ii) *Equity*

Appurtenant to the equity of redemption created in courts of equity and in contrast with how courts of law handled mortgages has been how Alabama's courts of equity have consistently treated mortgages as a different type of creation than its courts of law. The courts of equity have regarded the mortgagee as holding under the mortgage contract legal title to a property in trust as security for the debt. *See, e.g., Askew v. Sanders,* 84 Ala. 356, 4 So. 167, 168 (1888). Thus, Alabama's courts of equity have allowed the mortgagor the right to redeem even after default so long as (i) the redemption occurred before a foreclosure sale, and (ii) the redemption was asserted before expiration of the period which would bar a suit for recovery of the prop-

erty in a court of law. *Bank of Florala,* 66 So. at 833. This equity of redemption has been described as "a right to perform the condition, on making compensation to the mortgagee, which is regarded as an estate in lands, separate from the legal estate, alienable or transmissible by descent or devise." *Welsh,* 54 Ala. at 315; *see also Commercial Fed. Mortgage Corp. v. Smith (In re Smith),* 85 F.3d 1555, 1557–1558 (11th Cir.1996); *Jim Walter Homes, Inc. v. Saylors (In re Saylors),* 869 F.2d 1434, 1437 (11th Cir.1989); *Morrison,* 747 F.2d at 613.

The equity of redemption is lost once the mortgaged property is sold at foreclosure. *Summerford v. Hammond,* 187 Ala. 244, 65 So. 831 (1914). However, this begins the period when Alabama's statutory right of redemption may be exercised. It, too, is circumscribed by time. Currently, the statutory redemption period is one year after the foreclosure sale. Ala. Code § 6–5–248 (1993). Under Alabama's current real property statutes and unlike equitable redemption, this right is not considered an estate in lands and its transferability is restricted. *See* Ala.Code § 6–5–248 (1993). This has not always been the case for statutory redemption. *See Brannan v. Adams,* 202 Ala. 442, 80 So. 826, 827 (1919).

#### (iii) *The Split*

The significance of the split view of mortgages between Alabama's courts of law and its equity courts is two-fold. First is that a suit brought over a mortgaged property in a court of law could avail one of only specific remedies which did not include seeking to enforce one's equitable right of redemption. To do this, one had to resort to a court of equity. *See Bank of Florala,* 66 So. at 833; *McCurdy,* 74 Ala. at 169; *Randolph,* 60 Ala. at 360; *Welsh,* 54 Ala. at 315. The proper court selection-for-remedy trap for the unknowledgeable changed in Alabama no later than the 1973 effective date of the adoption of its rules of civil procedure. This is a repercussion of Alabama's merger of law and equity counts

which is overlooked by many: when dealing with opinions of courts deciding issues before the merger, one needs to be sure that one does not misuse the citation of a legal principle by a court of law as the rule for a combined court of law and equity. Secondly, Alabama's courts have differentiated mortgages in the following fashion. Unlike its courts of law which treated mortgages as conveyances of legal title, the courts of equity viewed them as merely creating a lien. *See Randolph*, 60 Ala. at 360; *Welsh*, 54 Ala. at 315. This means that a debtor/mortgagor's interest in the mortgaged property was different at law than that in a court of equity. In equity, title and possession remained in the mortgagor subject to the lien created by the mortgage. *See Bank of Florala*, 66 So. at 833; *Marks v. Robinson*, 82 Ala. 69, 2 So. 292, 295 (1887); *Rutherford*, 73 Ala. at 155.

### (d) *The Merger—The Often Overlooked Factor*

In Alabama's law courts prior to their merger with the courts of equity, the rule regarding who held title and had the right of immediate possession of mortgaged property on a debtor's default was unquestionably that recited *Hall Motors*: legal title and the right of possession of the mortgaged property vested absolutely on a mortgagor's default. *See McCurdy*, 74 Ala. at 169; *Bank of Florala*, 66 So. at 833; *Harmon v. Dothan Nat'l Bank*, 186 Ala. 360, 64 So. 621 (1914); *Randolph*, 60 Ala. at 360; *Welsh*, 54 Ala. at 315. One problem with the *Hall Motors* cited Alabama case law for this proposition—*Pierce, American National Bank,* and *Thompson*—is that two of the cases on which they relied and to which each cites for the same conclusion, *Automotive Acceptance* and *Harmon,* were pre-merger of law and equity cases which only took into account the law side of the legal equation. The other, *Rainey*, was decided in 1975 after the merger, but it arrived at its statement of mortgage law by use of two opinions, *Rhodes–Carroll Furniture Co. v. Webb*, 230 Ala. 251, 160 So. 247 (1935) and *First*

*Nat'l Bank of Butler v. Sturdivant*, 288 Ala. 133, 258 So.2d 715 (1972), both decided before this joining of Alabama's courts. *Rainey*, 313 So.2d at 183. They, too, quoted only the rule in an Alabama court of law.

### (e) *Two Types of Mortgages*

Coupled with the differing law court-equity court treatments of what a mortgagor/debtor retained and a mortgagee/creditor obtained in a mortgage transaction is the fact that Alabama's courts have recognized two types of mortgages: legal mortgages and equitable mortgages. In *Jackson, Morris & Co. v. Rutherford*, 73 Ala. 155, 156–157 (1882), this is how they were described:

> The distinction between the two is well settled, and their ear-marks easily distinguishable. Every valid agreement for a lien or charge on property, with the intention of creating a security for a debt, which would exist without delivery of the property to the creditor, constitutes an equitable mortgage.—*Donald v. Hewitt*, 33 Ala. 534 [(1859)]; *Butts v. Broughton*, 72 Ala. 294 [(1882)]. Such agreements do not operate to convey a legal title, the intention being merely to create a charge in rem, which can be enforced only by a resort to a court of equity, with its exclusive jurisdiction of trusts.—*Fletcher v. Morey*, 2 Story, 555; *Dunning v. Stearns*, 9 Barb. (N.Y.) 630; *Newlin v. McAfee*, 64 Ala. 357 [(1879)]
> . . .

There can be no legal mortgage of chattels, however, without a transfer of the legal title to the mortgagee, such as will become absolute on default. Such a mortgage is something more than a mere lien, or security. It is rather in the nature of a conditional sale, and operates to transfer such a legal title to the mortgagee, that to be divested the condition must be discharged in full.—Jones' Chat.Mortg. §§ 1, 9. It differs from a mere pledge, in which the possession is parted with, and the title retained.—*Sims v. Canfield*, 2 Ala. 555

[(1841)]; *Brown v. Bement*, 8 Johns. 96 (N.Y.1811). It is true that no technical words are necessary to constitute a mortgage which would be good at law, any more than in equity. Any words would be sufficient which serve to show a transfer of the mortgaged property as security for a debt. 'Whatever language may be used, if it shows that the parties intended a sale of the chattels as security, the instrument will be construed to be a [legal] mortgage.'—Jones' Chat. Mort. §§ 1, 8, 9. This we take to be the decisive test, and nothing less will answer the purpose.—Herman's Chat. Mortg. § 96; *Toomer v. Randolph*, 60 Ala. 356 [(1877)]; 4 Kent's Com. 136; 1 Washb. Real Prop. 475; 4 Waits' Act. & Def. 512.

Several salient points are contained in *Jackson, Morris & Co.* One is that to be a legal mortgage, there must be a transfer of legal title to the mortgagee. Another is that an equitable mortgage conveys a lien interest—not a title interest. A third is that whether a mortgage is a legal mortgage or an equitable mortgage is in part a fact based inquiry to determine the intent of the parties. In every instance, the decision on what form of mortgage is at issue requires a fact determination.

As the reader may have gleaned, this Court has used Alabama case law discussing mortgages of real property and those for personalty, chattel mortgages, interchangeably. That is because Alabama's courts have held that the common law rules governing both, absent statutory modification, are identical. *See Zimmern v. People's Bank of Mobile*, 203 Ala. 21, 81 So. 811, 813 (1919); *Burns v. Campbell*, 71 Ala. 271 (Ala.1882). Mortgages of real estate and personal property are not the only categories of title security devices which share an identity of rules between law and equity. Another is the conditional sale where title to property is held by the seller/vendor until the purchase price is paid in full. *See Perkins v. Skates*, 220 Ala. 216, 124 So. 514, 515 (1929); *Fair-banks, Morse & Co. v. The Eureka Co.*, 67 Ala. 109 (1880).

### (f) *Conditional/Installment Sales*

Alabama's courts have treated the effect of conditional sale agreements like they have mortgages. In a court of law, the vendor who/which retained title until the sales price for the property was paid was treated akin to the mortgagee with generally the same rights, remedies, and limitations on each as a mortgagee. The vendee was accorded the same right, remedies and limitations on each as the mortgagor. In equity, however, a conditional sale arrangement was accorded the status of security for a debt, just as a mortgage. *Moses v. Johnson*, 88 Ala. 517, 7 So. 146, 147 (1890).

 Despite this similar treatment of mortgages and conditional sale contracts in courts of law and courts of equity, Alabama's courts did not recognize them as one and the same. They have long held that for the same transaction one may not be both a vendor and mortgagee just as one may not be vendee and mortgagor. *Cousins v. Crawford*, 258 Ala. 590, 63 So.2d 670, 678 (1953). Also, conditional sales have traditionally been disfavored by the courts of Alabama. *Bern v. Rosen*, 259 Ala. 292, 66 So.2d 711, 713 (1953); *Cousins*, 63 So.2d at 678. The why of disfavor arises from the nature of a conditional sale. If the purchaser defaulted, the seller retained the property being sold. *Perkins*, 124 So. at 515 (Ala.1929); *see also Cousins*, 63 So.2d at 677. There was no deficiency of purchase price recoverable because, unlike a mortgage, there was no debtor-creditor relationship. Since the seller retained the property on a purchaser's default, conditional sale contracts were viewed as causing a forfeiture of the purchaser's interest in the property. *Cousins*, 63 So.2d at 678–679.

 This dislike by Alabama's courts caused them to critically view conditional sale contracts and similar arrangements. Where evidence demonstrated that what

was intended was something other than a conditional sale, the transaction was treated as a mortgage. *See Cousins,* 63 So.2d at 677–678; *Automotive Acceptance,* 234 So.2d at 602–603; *Lloyd's of London v. Fidelity Secs. Corp.,* 39 Ala.App. 596, 105 So.2d 728, 733–734 (1958); *see also Ison Fin. Co. v. Glasgow,* 266 Ala. 391, 96 So.2d 737, 738 (1957); *Bern v. Rosen,* 259 Ala. 292, 66 So.2d 711, 713 (1953); *Brock v. Brock,* 245 Ala. 296, 16 So.2d 881, 883–884 (1944). Once more the determination of whether the transaction was a mortgage or a conditional sale contract was a fact based query for each transaction. *Cousins,* 63 So.2d at 678.

 Some of the factors reviewed were whether the contract was called something other than a conditional sale contract, whether it referred to or contained a promissory note, whether it had provisions for acceleration of all future payments upon default, repossession, foreclosure, sale, and the return of sales proceeds in excess of what is owed. Of singular importance was whether it provided for a deficiency claim against the purchaser. Each of these were considered evidence of a debt, not of a conditional sale. *Automotive Acceptance,* 234 So.2d at 602–603; *Lloyd's of London,* 105 So.2d at 734. If determined to be a debtor-creditor relationship, what was made to look like a conditional sale was instead treated by Alabama's courts as a mortgage. *Perkins,* 124 So. at 516.

This was not necessarily the end of the inquiry. For to be a legal mortgage, its requisites had to be met. *See Richards v. Montgomery,* 230 Ala. 307, 160 So. 706, 707 (1935); *Oden v. Vaughn,* 204 Ala. 445, 85 So. 779, 783 (1920); *Jackson, Morris & Co.,* 73 Ala. at 156–157; *Mervine v. White,* 50 Ala. 388 (1874). As already indicated one of the most crucial was to have legal title in the proper party. If the facts

evidenced title to be in the purchaser of property and this was the intent of the parties, the transaction generally could not be a legal mortgage, but it could be an equitable mortgage. *See Bank of Florala,* 66 So. at 832; *Jackson, Morris & Co.,* 73 Ala. at 157.

The purpose of this somewhat lengthy, yet truncated discussion of Alabama mortgage law is that it shows the inquiry this Court must make of the Greene—The Associates financing arrangement under the law utilized by *Hall Motors.* At the same time, it points out why more facts regarding the Elgin Lewis–Hall Motors contractual relationship would help in resolution of whether the *Hall Motors* holding binds this Court to apply it in this case.

(g) *The Deduction from Hall Motors— Legal Mortgage Required*

 Despite this, the Alabama law of mortgages allows for one indisputable deduction from *Hall Motors.* It is that whatever form of security creating device was used, it had to have been and/or was presented to the Eleventh Circuit as a case involving what Alabama's courts classified as a legal mortgage. This of necessity arises from the state of affairs under Alabama law that the principle of legal title and the immediate right to possession vesting automatically in a creditor on default by a debtor is only applicable when a legal mortgage or a valid conditional sale is involved.[7] As part of the attempt to rationalize *Hall Motors* with Alabama's law and to attempt to gain insight into what may have been the genesis of the *Hall Motors* ruling, this Court obtained a copy of the Hall Motors–Lewis contract from three (3) sources. They were from Hall Motors' counsel and Mr. Lewis' 1992 Chapter 13 and 1995 Chapter 13 case files which both had the contract attached to the respective proofs of claims filed by Hall Motors.[8] The contract in question

---

**7.** There were other title devices where this rule may have been applied such as trust receipts, bonds for title, and the like. These are outside what needs to be considered in this case. However, their use would not alter the outcome of this affair.

**8.** Also obtained and studied were the court files in the 1993 Chapter 13 bankruptcy case

had a provision which retained title in *Hall Motors*.

### (h) *Consistency Among and Between Law—Same Rules, No Error of Law*

At this point, a few further comments on the consistency among and between the law of mortgage and conditional sale contracts, Alabama's Uniform Commercial Code, and its Uniform Certificate of Title and Anti–Theft Act regarding the case-by-case analysis of facts necessary to ascertain what form of security device is being used. The cases already cited reflect that the review under Alabama's mortgage and conditional sale law did not stop at the caption of the document. The intent was also to be ascertained through various means including by review of the contract terms for any inconsistent portions which evidenced a transaction other than the name given to describe it.

The same occurs under both Alabama's Uniform Commercial Code and its certificate of title statute. That this is so under the Uniform Commercial Code is shown by Ala.Code § 7–9–102(1) & (2) coupled with the official comment to it containing this wording "the principal test whether a transaction comes under this article is: Is the transaction intended to have effect as security?" Ala.Code § 7–9–102 official

comment (1997). The comment continues that if a "security interest defined in § 7–1–201(37)[a] was intended, Article 9 applies regardless of the form used or name given to it by the parties." Ala.Code § 7–9–102 official comment 1 (1997); *see also Commerce Union Bank v. John Deere Industrial Equipment Co.*, 387 So.2d 787 (Ala. 1980).

As for Alabama's Uniform Certificate of Title and Anti–Theft Act, it enables a creditor to perfect a security interest in a motor vehicle subject to its provisions by having what it refers to as a lien, *see* Ala.Code § 32–8–2(6) (1999), recorded on the certificate of title, Ala.Code § 32–8–61 (1999). However, this statute specifies that the certificate of title is only prima facie evidence of the facts appearing on the certificate. Ala.Code § 32–8–39(d) (1999); *Cincinnati Ins. Co. v. Nelson*, 668 So.2d 539 (Ala.1995); *Thrasher v. Thrasher*, 674 So.2d 595 (Ala.Civ.App.1995); *Murray v. Dempsey*, 521 So.2d 1345 (Ala.Civ.App. 1988). Thus, should title to a motor vehicle be issued in the seller or secured party's name, a fact question can still exist regarding whether the title issued in a secured party's name was intended to only create a lien or security interest.

The thrust of this consistency of having a fact based analysis to decide what the

---

of Elgin Lewis, case number 93–41332, initiated in the United States Bankruptcy Court for the Northern District of Alabama, Eastern Division, the complete trial court file of the adversary proceeding which was captioned *Elgin Lewis v. Charles R. Hall, Inc.*, A.P. # 93–40044, (the Adversary Proceeding), the transcript of the trial held in the Adversary Proceeding plus the other evidence submitted during the trial, the oral and written arguments submitted by the parties at the trial level, the appellate court files for the United States District Court for the Northern District of Alabama, and that of the United States Court of Appeals for the Eleventh Circuit coupled with the designated trial level evidence utilized along with the briefs submitted on appeal. Unfortunately, the tapes of the oral argument were no longer available.

This Court also examined the case files for two other Chapter 13 proceedings filed by Mr.

Lewis. One is case number 92–42760 and the other is case number 95–42486, both filed in the Northern District of Alabama, Eastern Division. The 1995 Chapter 13 case file evidences a fact apparently not made known to the appellate courts: before the District Court's ruling and that of the Eleventh Circuit in *Hall Motors*, Mr. Lewis had obtained possession and use of the motor vehicle over which Hall Motors and he fought in the Adversary Proceeding. In fact, Elgin Lewis represents in the schedules filed in his 1995 Chapter 13 case on October 23, 1995, that this motor vehicle was in his possession at that time. This was over two years before the opinion of the Eleventh Circuit. For this reason it is obvious that who had possession of the automobile valued at about $1,000.00 is not what was at issue between the contesting parties in *Hall Motors*.

parties to a contract intended to be the form of security for performance of an obligation is that no matter which law one may argue should apply—Alabama's law on mortgages, conditional sales, secured transactions under Article 9, or security interests and titles under its uniform statute for certificates of title for motor vehicles—each provides for the same examination to locate what is the true nature of the arrangement. It also means that the correct performance of such an examination by this Court under what is an identical standard of review under each of these laws may not be the basis for a well-founded complaint that the wrong law was followed. Given this background of law, it is the Greene—The Associates facts which must now be considered.

### (i) *Application to Greene— The Associates*

 In this Greene—The Associates matter, the facts could not more plainly evidence the true nature of the transaction. The Mustang Contract has only language which grants The Associates a security interest. It contains no other provisions which are inconsistent with or contradict that the intent was to grant The Associates no greater interest in the Mustang than what is a security interest as defined under Article 9 of Alabama's Uniform Commercial Code. There is no different inference from the evidence regarding the certificate of title. Mr.

Greene is the owner/title holder and The Associates is the lienholder. The title certificate lists The Associates as the first lienholder. Also, what a creditor/secured party perfects under the Uniform Certificate of Title and Anti–Theft Act is a security interest. Article 3 of Title 32 is captioned "Security Interests." Under Ala. Code §§ 32–8–60 *et seq.*, it is a security interest which if not perfected as specified is "not valid against creditors of the owner or subsequent transferees or lienholders of the vehicle ...." Ala.Code § 32–8–61(a) (1999).[9]

The Mustang Contract is captioned "Retail Installment Contract & Security Agreement" and contains a promise to pay the total of payments due of $21,889.44. It states the Mustang may be bought for cash or on credit. It provides for payment of costs incurred for collection of "what you [Mr. Greene] owes." It has a default paragraph which shows Mr. Greene's waiver of demand for payment, presentation of payment, notice of intent to accelerate maturity, notice of maturity having been accelerated, protest, and notice of protest. This is a waiver for what are traditional requirements of the law on default in payment of a promissory note. Also, there is the right on default of The Associates to accelerate the entire unpaid balance, repossess and sell the Mustang, and collect any deficiency owed on the debt. These

---

**9.** As with Alabama's Uniform Commercial Code, its Uniform Certificate of Title and Anti–Theft Act, Ala.Code §§ 32–8–1 *et seq.* (1999), is a standardized version of a uniform statute adopted by various jurisdictions to harmonize the law between and among them relating to, among other things, perfection of security interests in covered motor vehicles. In this regard, there is a striking congruity of Alabama's Uniform Commercial Code and its Uniform Certificate of Title and Anti–Theft Act. What a creditor/secured party perfects under both is a security interest—not title. This certificate of title statute defines security interest as an interest in a vehicle or manufactured home reserved or created by agreement which secures payment or performance of an obligation. Ala.Code § 32–8–2(19) (1999). Appended to the Alabama stat-

utory definition of security interest is the way Alabama has in Ala.Code § 32–8–2(6) (1999) defined how a lien is created—not title in or to a motor vehicle. A lien may be created by use of an installment sale, conditional sale, a reservation of title, a deed of trust, a chattel mortgage, a trust receipt, "and every written agreement or instrument of whatever kind or character whereby an interest other than absolute title is sought to be held or given on a motor vehicle...." Ala.Code § 32–8–2(6) (1999).

The quintessence of these certificate of title *sections is that if the intent of the parties is to create a security interest or lien that is all that is created and conveyed to or retained by a secured party. This is precisely what the Uniform Commercial Code provides.*

all evidence a debt and a debtor-creditor relationship. The Mustang Contract also lists the Uniform Commercial Code as one of the laws governing its terms. Finally, it has a provision for the assignment of the contract which was exercised virtually contemporaneously with Mr. Greene's execution of the Mustang Contract which is a further indication that the transaction was in substance one creating a debtor-creditor relationship, not a seller-purchaser one.

When applied to any of the laws one might argue are relevant, Alabama's mortgage, conditional sale, Uniform Commercial Code, or Uniform Certificate of Title and Anti–Theft Act, the result is invariable. All The Associates obtained was a security interest or lien in the Mustang and Mr. Greene retained both legal title to and the right to possession of the Mustang.

By a review of the mortgage versus conditional sale contract factors set forth in this memorandum opinion from *Automotive Acceptance* and *Lloyd's of London* on what evidences something other than a conditional sale, the conclusion forced by them is that the Greene—The Associates transaction cannot be a conditional sale under Alabama law. If for no other reasons, title to the Mustang was not in, nor intended to be in, The Associates, and the Mustang Contract has all of the indices of a debt instrument despite its caption.

Likewise and under both Alabama's Uniform Commercial Code and its Uniform Certificate of Title and Anti–Theft Act, the Mustang Contract merely gives The Associates a security interest in the Mustang. This is what the Mustang Contract provides, what its contents evidence was intended, and what the other facts presented demonstrate. In fact, the best proof of intent is that consistent with the contract terms the Mustang was titled in Mr. Greene's name as the owner and The Associates only obtained the perfection of its security interest by having a lien recorded on the title.

Lastly and even if Alabama's pre-Uniform Commercial Code law is argued to control, the Greene—The Associates transaction fails to meet the minimum requirements of a legal mortgage under Alabama law. The quintessential proof of this is that title to the motor vehicle is not in The Associates. Moreover, it was not intended by either party that title to the Mustang be held by anyone other than Mr. Greene. The intent demonstrated is that the Mustang was to be security for a debt. As a result and at best, what The Associates would have under Alabama's mortgage law is an equitable mortgage. This means that Mr. Greene holds legal title and the right to possession of the Mustang subject to the lien of The Associates. This is no more and no less than what The Associates obtained under Alabama's Uniform Commercial Code and its certificate of title statute. Regardless of which of these laws one may argue applies, this outcome is unchanged.

This leads to the inescapable conclusion that the facts of this case are not the equivalent of those of *Hall Motors* where a valid legal mortgage, conditional sale, or similar method of title retention in the seller/secured party had, as a matter of Alabama law, to have been the method used to ensure Hall Motors protected its interests until the vehicle obligation was fully paid. The upshot is that the inequality of facts between the *Hall Motors* and the Greene—The Associates transactions causes a different outcome under the applicable Alabama law determining if Mr. Greene has an interest in the Mustang. For this reason, *Hall Motors* does not control the outcome of this case as The Associates proffers. Under the law of Alabama as applied to the facts of this case, Mr. Greene held as of the filing of his bankruptcy case both legal title to and a possessory interest in the Mustang until a proper sale or disposition of it in accordance with Alabama's Uniform Commercial Code. Of necessity under federal law is that this interest in the Mustang became property of his bankruptcy estate under

§ 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a), on the filing of his petition in bankruptcy on August 3, 1999. *See Whiting Pools,* 462 U.S. at 210–211, 103 S.Ct. 2309.

### B. *Law—First In Time Rule*

#### (1) *The Analogy*

Solidifying why *Hall Motors* is not binding precedent on this Court on the issue of whether the Mustang became "property of the estate" in Mr. Greene's bankruptcy case is the existence of earlier precedent of the United States of Appeals for the Eleventh Circuit and the Supreme Court of the United States, both of which have held the opposite of *Hall Motors* on whether under Alabama law the right of redemption is an interest in the property serving as collateral. Before discussing the earlier controlling precedent with Alabama's undeviating holdings on the same redemption issue, an outline of how *Hall Motors* reached its conclusion will reveal a subtlety inherent in the analogy used by the *Hall Motors* court which most probably caused it to overlook Alabama's law regarding one's equity of redemption.

#### (a) *The Subtlety*

The *Hall Motors* panel concluded that Elgin Lewis "did not retain title, possession or any other functionally equivalent ownership interest in the repossessed automobile." *Hall Motors,* 137 F.3d at 1284. It then recognized that he had the right of redemption under § 7–9–506 of Alabama's Uniform Commercial Code which allows redemption at any time before disposal of the collateral, entry into a contract for its disposal, or the discharge of the obligation under § 7–9–505(2) by the secured party's retention of the collateral. Next, the court analogizes to prior panel opinions of the Eleventh Circuit which dealt with Alabama's statutory right of redemption for real property and concluded that the statutory right of redemption became property of the estate under § 541 of the Bankruptcy Code. In the *Hall Motors* opinion are citations to *Commercial Fed. Mortgage*

*Corp. v. Smith (In re Smith),* 85 F.3d 1555, 1558 (11th Cir.1996); *Jim Walter Homes, Inc. v. Saylors (In re Saylors),* 869 F.2d 1434, 1437 (11th Cir.1989), for this proposition. The *Hall Motors* citation to *Saylors* also references that the *Saylors* court cited to *Wragg v. Federal Land Bank of New Orleans,* 317 U.S. 325, 63 S.Ct. 273, 87 L.Ed. 300 (1943).

The analogy was "[f]inding no reason not to extend this principle to personal property, we readily conclude that Elgin Lewis's *statutory right of redemption* in the automobile became 'property of the estate . . .' " *Hall Motors,* 137 F.3d at 1284 (emphasis added). Next is set forth that the *Hall Motors* panel is not convinced that the statutory right to redeem "renders the automobile itself 'property of the estate.' " Lastly, the *Hall Motors* court relies by analogy on and extrapolates to personal property *Commercial Federal*'s holding that this statutory right of redemption for real estate cannot be modified under a Chapter 13 plan. *Hall Motors,* 137 F.3d at 1284–1285.

Here is the subtlety in the analogy. There is a basic difference between Alabama's statutory right of redemption relied on in *Commercial Federal,* mentioned in *Saylors,* and reviewed—although a predecessor version to that in question in *Commercial Federal* and *Saylors*—in *Wragg,* when compared to the right to redeem set forth in § 7–9–506 of Alabama's Uniform Commercial Code. The right of redemption in Ala.Code § 7–9–506 (1997) is redemption before disposition of the collateral. As such, it is the statutory embodiment in the Uniform Commercial Code of the equity of redemption. Also, it may be a redemption right set forth in a statute, but it most certainly is not the type of statutory right of redemption referred to in *Commercial Federal* or the kind of statutory right contemplated in *Hall Motors.*

#### (b) *Equity of Redemption—Not Akin to Statutory Right for Real Property*

Unfortunately, *Hall Motors* treated the Uniform Commercial Code's

redemption provision as if it was the same right for personal property as the statutory right to redeem real property under Alabama's mortgage laws. It is not. The statutory right to redeem for real property is a right which does not exist until after foreclosure and after the equitable right to redeem is ended by the foreclosure sale. *Fed. Deposit Ins. Corp. v. Morrison,* 747 F.2d 610, 613 (11th Cir.1984); *Summerford,* 65 So. at 831; *Harmon,* 64 So. at 623. Furthermore, the Alabama statutory right for real property discussed in *Commercial Federal* and *Saylors* is expressly characterized by Alabama's statute to not be a property interest. It is a mere personal privilege. *Commercial Fed.,* 85 F.3d at 1558; *Saylors,* 869 F.2d at 1437; *Morrison,* 747 F.2d at 613–614. This remains unchanged. Ala.Code § 6–5–250 (1993).

■ Unlike Alabama's current treatment of its statutory right of redemption for real estate, Alabama has had an unswerving common law vision of what is the equity of redemption. The Supreme Court of Alabama has for over a century held it to be an interest in the mortgaged property. *Dominex, Inc. v. Key,* 456 So.2d 1047, 1053 (Ala.1984) (Equity of redemption exists prior to foreclosure and is deemed an interest in the property.); *Hodges v. Hodges,* 276 Ala. 624, 165 So.2d 707, 708 (1964) (Equity of redemption is that interest "in the land which is held by the mortgagor, before foreclosure".); *Burr v. Fox,* 227 Ala. 543, 150 So. 911, 913 (1933) (Mortgagor's equity of redemption regarded as an estate in land.); *Zimmern v. People's Bank of Mobile,* 203 Ala. 21, 81 So. 811, 813 (1919); *Lewis v. McBride,* 176 Ala. 134, 57 So. 705, 706 (1912) (Equity of redemption is that interest in the land held by mortgagor before foreclosure.); *Rainey v. McQueen,* 121 Ala. 191, 25 So. 920, 923 (1899) (Equity of redemption "is a substantial interest in the land itself."); *Welsh v. Phillips,* 54 Ala. 309 (1875) (Regarded as an estate in lands separate from the legal estate, alienable or transmissible by descent or devise.).

In *Zimmern,* Alabama's court makes clear that the same rule applies to mortgages of personal property. *Zimmern* further specifies that the equity of redemption is an interest in the mortgaged property and to any excess sales proceeds should the mortgaged property be sold. The court's wording is:

> It has been held that an equity of redemption remaining in the mortgagor of land is a property interest. *Welsh v. Phillips,* 54 Ala. 309, 315, 25 Am.Rep. 679; *Rainey v. McQueen,* 121 Ala. 191, 195, 25 So. 920; *Lewis v. McBride,* 176 Ala. 134, 137, 57 South. 705—among others. *The like equity of redemption exists with respect to mortgaged chattels. Davis v. Hubbard,* 38 Ala. 185, 189. In further definition of the nature and measure of the equity of redemption, it was said in *McGough v. Sweetzer,* 97 Ala. 361, 364, 12 So. 162, 163 (9 L.R.A. 470), Stone, C.J., writing:
>
> "*A mortgage in equity and in fact is only a security for the payment of a debt. It does not convey all the interest of the mortgagor. So soon as the debt is paid, the entire ownership revests in him. So likewise, if the property conveyed in the mortgage is more than sufficient to pay the debt, that balance when ascertained belongs to the mortgagor. This privilege and residuum of interest constitutes what is known as the mortgagor's equity of redemption. *** *"

*Zimmern,* 81 So. at 813 (emphasis added); *see also De Moville v. Merchants & Farmers Bank of Greene County,* 237 Ala. 347, 186 So. 704 (1939); *Harmon,* 64 So. at 622–624.

This case law makes unequivocal Alabama's stand on the equity of redemption as constituting an interest in the mortgaged property. This is in sharp contrast to the *Hall Motors* court's conclusion that Elgin Lewis did not retain "any other functionally equivalent ownership interest in the repossessed automobile." *Hall Motors,* 137 F.3d at 1284. Alabama's equity

**616**

of redemption status as an interest in the underlying mortgaged property proves wrong the *Hall Motors* conclusion that one in Alabama who finances the purchase of an automobile on default and following its repossession loses "any other functionally equivalent ownership interest" in the motor vehicle. This body of Alabama case law simultaneously proves invalid the *Hall Motors* analogy to Alabama's post foreclosure right of redemption for real property.

### (c) *Already Decided*

This error is further highlighted by the controlling law. In 1989 in *Saylors*, the United States Court of Appeals for the Eleventh Circuit applied Alabama's law of mortgages and determined that the equity of redemption was an interest in the mortgaged property which was property of Mr. and Mrs. Saylors' bankruptcy estate. What is set forth is

Contrary to the district court's conclusion *Saylors still had an equitable interest in his home on January 26, 1988 that* was subject to the bankruptcy court's jurisdiction.

*Saylors*, 869 F.2d at 1437 (emphasis added). A couple of sentences later, the *Saylors* court concludes that either Alabama's equity of redemption or its statutory right of redemption "is sufficient to give the bankruptcy court jurisdiction over *a debtor's home.*" *Saylors*, 869 F.2d at 1437 (emphasis added). The *Saylors* court's authority for this is *Wragg v. Federal Land Bank of New Orleans*, 317 U.S. 325, 63 S.Ct. 273, 87 L.Ed. 300 (1943).

*Wragg* was a decision under the Bankruptcy Act of 1898 in which the Supreme Court addressed whether a federal court had jurisdiction over a bankrupt's interests, if any, in real property under Alabama law. The *Wragg* opinion contains this

Looking at the scope and purpose of s 75 [conferring jurisdiction over a debtor's equity of redemption where the redemption right has not ended], we think *petitioner's interest in the mortgaged property, whether it be denominated a property right or a privilege of redemption,* is an interest intended to be subject to the court's jurisdiction and is capable of administration in a farmer-debtor proceeding.

*Wragg*, 317 U.S. at 328–329, 63 S.Ct. 273 (emphasis added).

This much is evident from *Wragg* and *Saylors*, both courts recognized that the equity of redemption under Alabama law was an interest in the mortgaged property. This was and is in accord with Alabama's courts' holdings. The impact of *Wragg* and *Saylors* is that both used the equity of redemption to cause the underlying real property to be dealt with in the respective bankruptcy cases. As the quoted language from both *Wragg* and *Saylors* indicates, each considered for federal, bankruptcy law purposes that the equity of redemption was not a property interest separate and distinct from the mortgaged realty. Both indicated they knew it to be an interest in the real property.

### (2) *Cohen II—Bonner*

■ Once one recognizes that (i) *Wragg* and *Saylors* did not treat under federal, bankruptcy law Alabama's equity of redemption for real property as a separate class of property from the mortgaged property, and (ii) Alabama law treats identically the equity of redemption for both real and personal property as being an interest in the mortgaged property, the outcome regarding *Hall Motors'* applicability to this Greene—The Associates adversary proceeding is predetermined for this Court.

Under the Eleventh Circuit's recent decision in *Cohen v. Office Depot*, 204 F.3d 1069 (11th Cir.2000) (hereinafter *Cohen II* ) the court restates this Circuit's rule that each succeeding panel is bound by the holdings of the first panel to address the same issue of law, unless and until overruled *en banc* or by the Supreme Court. *Cohen II*, 204 F.3d at 1072. On first consideration, one might think this *stare decisis* based rule may not apply to preclude *Hall Motors* from being the law governing

the Greene—The Associates fight. This consideration is eliminated by *Cohen II.*

In *Cohen II,* a question of federal law was addressed regarding aggregation of punitive damages in a class action to satisfy the federally mandated jurisdictional amount-in-controversy requirement. In part in *Cohen II,* resolution of whether the single punitive damage claim for the class could be attributed to each and every class member so individually they could meet the required amount-in-controversy standard under *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) was dependent on the nature of punitive damages under Florida law. In its prior opinion, *Cohen v. Office Depot, Inc.,* 184 F.3d 1292 (11th Cir.1999) (hereinafter *Cohen I* ), the panel had relied on a prior Eleventh Circuit panel opinion, *Tapscott v. MS Dealer Service Corp.,* 77 F.3d 1353 (11th Cir.1996), for the rule for when punitive damages may be aggregated to satisfy the amount-in-controversy requirement. *Tapscott* was decided using Alabama law on the nature of punitive damages.

After the *Cohen I* decision, the panel was directed by Office Depot in a petition for rehearing to an earlier, conflicting decision on aggregation of punitive damages also involving Alabama law, *Lindsey v. Alabama Tel. Co.,* 576 F.2d 593 (5th Cir. 1978), from the "old" Fifth Circuit. Under *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981), the *Cohen II* panel concluded that it was bound to follow *Lindsey.*

In *Cohen II,* the panel concluded that since the same state law on the nature of punitive damages applied in *Tapscott* and *Lindsey,* there could be no difference between the two cases on the "common and undivided interest" analysis of aggregation for class jurisdictional amount purposes. *Cohen II,* 204 F.3d at 1074–1075. Because the court had decided in *Cohen I* that the

nature of punitive damages under Florida law was the same as Alabama's used in *Lindsey,* the court in *Cohen II* held there could be no difference between the Cohen–Office Depot case and *Lindsey* "stemming from . . . [the] analysis of state punitive damages law." *Cohen II,* 204 F.3d at 1075.

What occurred in *Cohen I* and *Cohen II* was resolution of a federal legal issue, class aggregation of punitive damages claims which required inquiry into the nature of punitive damages under Florida law. There were two prior holdings on this aggregation issue involving Alabama law on the nature of punitive damages. The first holding, *Lindsey,* was the one the *Cohen II* court held was required to be followed under *Bonner* because of no difference in Florida's law on the nature of punitive damages from that of Alabama.

In this Greene—The Associates case, the same follows on the issue of whether the equity of redemption is an interest in the mortgaged property. The *Hall Motors* court concluded it was a separate property interest from the automobile involved. Prior to *Hall Motors,* the *Saylors* panel concluded the equity of redemption in real property was an interest in the mortgaged real estate. Alabama's common law on mortgages of personal property has treated the equity of redemption in personal property just like that for real property: as an interest in the mortgaged personal property. There is no difference between the Alabama law treatment of the equity of redemption in personalty and realty. Therefore and as in *Cohen II,* there cannot be any difference between the *Hall Motors* ruling on what is "property of the estate" under federal law and that in *Saylors* stemming from any equity of redemption analysis of state mortgage law to determine a debtor's interest in property. As was the *Cohen II* panel, this Court is required to follow the *Saylors* determination on this issue under the *Co-*

hen II analysis and under *Bonner*. The same follows from the *Wragg* determination on this issue.[10]

In this instance, *stare decisis* makes *Hall Motors* the wrong law. Accordingly and under the Eleventh Circuit's holding in *Bonner* as followed in *Cohen II*, the

*Saylors* decision on this issue in reliance on the Supreme Court's holding in *Wragg* is the governing law on the equity of redemption being an interest in Mr. Greene's motor vehicle, the Mustang, and making the Mustang property of his bankruptcy estate under 11 U.S.C. § 541(a) on the filing of his bankruptcy petition.[11]

10. This Court has not overlooked the holding in *Southtrust Bank of Alabama, N.A. v. Thomas (In re Thomas)*, 883 F.2d 991 (11th Cir. 1989). In *Thomas*, the Eleventh Circuit panel resolved that the buyers/debtors who had financed the purchase of a mobile home under the terms of a conditional sale/installment sale contract where title to the mobile home was retained in the seller and possession given to the buyers did not have legal title to the mobile home. Then through use of 11 U.S.C. § 541(d), which does not deal with the *Thomas* type of case, the *Thomas* court held that the debtors' only interest which was property of the estate was their right to possession. The court also concluded that legal title and the mobile home were not part of the Thomas' bankruptcy estate. *In re Thomas*, 883 F.2d at 995–996. In spite of the *Thomas* court correctly finding that the debtors' possession of the mobile home converted the conditional sale contract into an equitable lien and made Alabama's treatment of the contract the same accorded by lien theory states, it reverted back to the title theory rule under Alabama's common law of legal mortgages and held it found no evidence the debtors held legal title. *In re Thomas*, 883 F.2d at 995–996.

*Thomas* was decided before mobile homes had to be titled under Alabama's Uniform Certificate of Title and Anti–Theft Act, Ala. Code § 32–8–30(b) (1999). Thus, no title issued to the debtors and under the conditional sale agreement title was retained in the seller. However, the *Thomas* court did part of what the *Hall Motors* court did. The *Thomas* opinion does not contain any reference to the Uniform Commercial Code. The opinion of the panel in *Thomas*, dated September 15, 1989, was after *Saylors*, decided April 10, 1989, *King–Porter*, a 1971 decision, and *Wragg*, a 1943 ruling. Despite this, *Thomas* does not mention *Saylors*, *King–Porter*, or *Wragg*. Added to these is the *Thomas* court's failure to recite any of the long history in Alabama that an equitable mortgage only gives the vendor/secured party a lien interest in the collateral and title and possession remain in the buyer/debtor. The panel also overlooked Alabama's common law on the equity of redemption being an interest in the mortgaged property. Thus for the same rea-

sons *Hall Motors* is not binding on this Court in this Greene Adversary Proceeding, *Thomas* is not: (i) the prior precedent rule of *Bonner* application of which to this case arises at a minimum from *Saylors* and *Wragg*, plus (ii) the critical fact difference with this case that title to the Mustang is held by Greene and all The Associates contracted for was a security interest in the Mustang. More simply, *Thomas* is inapposite to issues before this Court.

11. A more complex *stare decisis* application exists and arises from *Cohen II's* usage of the prior precedent governance rule. Since, in effect, the *Cohen II* court used the determination that Florida and Alabama treated the nature of punitive damages identically and that utilization of indistinguishable state positions could not result in a different outcome when part of the analysis of the federal law issue, it is arguable that *Cohen II* has applied the binding precedent rule of *Bonner* to include the methodology to be used when deciding the same issues of law under the same federal law incorporating different state's identical law determinations. Under this, *Cohen II* view, the *King–Porter* holding of the existence of a valid, perfected security interest held by the creditor/vendor using only the Uniform Commercial Code law of Mississippi—not its prior mortgage/conditional sales/ trust receipt law—which is identical to that of Alabama requires the same result. This argument is strengthened by the *King–Porter* court's view that the Uniform Commercial Code should generally be considered as "the federal law of commerce—including secured transactions" and its position that absent a contrary command in the federal bankruptcy law, no legally valid reason exists for not having resolution of creditor's claims in bankruptcy cases done in agreement with what Judge Dyer called "current business practice and understanding." *King–Porter*, 446 F.2d at 732. This was his euphemism for the Uniform Commercial Code. Such a position means, too, that *Hall Motors* under the *Bonner* first in time precedent rule is not binding on this Court. Rather, *King–Porter* is the precedent on how one makes determinations under the Uniform Commercial Code as the federal law of commerce for secured transactions.

## VI. Conclusion

After extended discussion and analysis of law which was required by the *Hall Motors* decision's foundational predicate of non-Uniform Commercial Code law, what is revealed is that the result obtained by use of the applicable Alabama law, its Uniform Commercial Code in conjunction with its Uniform Certificate of Title and Anti–Theft Act, is identical to that achieved by resort to the inapt Alabama law of chattel mortgages and conditional sales. This is an unnecessary analysis and review when one utilizes the Uniform Commercial Code in the fashion it was designed which is not to use jettisoned concepts of state law, i.e., mortgages, conditional sales, equity of redemption, and the lot discussed in Part V of this opinion, to resolve issues which are to be decided by reference to only the Uniform Commercial Code's provisions. Although there has been a resurrection of the law of the dead pledge by the *Hall Motors* ruling, hopefully there will not be an ascension of *Hall Motors* to a more widely recognized precedent and it will be re-interred for concerns of secured transactions under Article 9 of the Uniform Commercial Code and property of the estate under § 541 of the Bankruptcy Code, 11 U.S.C. § 541.

Based on the findings of fact and conclusions of law set forth in this memorandum opinion, the motion to dismiss which has been treated as a motion for summary judgment is denied. A separate order is to be entered consistent with and incorporating this memorandum opinion.